## Commonwealth v. Giacobbe, Appellant.

188

Argued January 21, 1941. Before Schaffer, C. J., Maxey, Drew, Linn, Stern, Patterson and Parker, JJ.

*William Langton Rubin,* of *Belmont, Benedetto & Rubin,* for appellant.

*Charles C. Gordon,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

Opinion by Mr. Justice Stern, March 24, 1941:

A multiplicity of assignments of error is usually an indication of weakness.[1] Here they are thirty-one in number, nearly all of them either trivial or so ruled

---

[1] See *Commonwealth v. Karamarkovic,* 218 Pa. 405, 406, 67 A. 650; *Commonwealth v. Glenn,* 321 Pa. 241, 245, 183 A. 763, 765.

by previous decisions as to be removed from the realm of the debatable. The one important question is whether the evidence, which was wholly circumstantial, is sufficient to support the verdict,—that of guilty of murder in the first degree with penalty of life imprisonment,— having regard to the well-established principle that "when a charge of crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved, and be consistent with them all. The evidence must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence": *Commonwealth v. Benz*, 318 Pa. 465, 472, 178 A. 390, 392; *Commonwealth v. Bardolph*, 326 Pa. 513, 521, 192 A. 916, 920; *Commonwealth v. Gabriel*, 130 Pa. Superior Ct. 191, 195, 196 A. 866, 868.

According to the Commonwealth's case, defendant was for twenty-five years the wife of Antonio Giacobbe, but there were admissions on her part that her married life was not a happy one. Giacobbe died on April 2, 1933. His body was exhumed in May, 1939, and some of the vital organs were extracted and turned over to the city chemists, Drs. Burke and Lampert, for analysis. Dr. Burke testified as to large quantities of arsenic which he found in the liver, stomach and kidneys, and which, he declared, were "far in excess of the usual amount of arsenic found in poisoning cases." Dr. Wadsworth, the coroner's physician, stated that, on the basis of Dr. Burke's report, it was his opinion that Giacobbe had died of arsenic poisoning. There was evidence that no arsenic had been prescribed for the deceased by any physician, and also that the embalming fluid used on his body contained none.

A number of industrial insurance policies in varying amounts had been placed on Giacobbe's life, in nearly all of which defendant was named as beneficiary, and

after his death she collected on them a total of approximately $3,800, including the proceeds of a policy of the John B. Stetson Company where the deceased had been employed. Not only did defendant participate largely in the negotiation of these policies, but some of them were taken out on her own initiative. On one occasion she requested the insurance agent not to mention the matter to her husband because he "didn't care much for insurance and I [the agent] would spoil it if I spoke to him about it." This agent prepared the application and asked Giacobbe to sign it without informing him as to its nature or even showing it to him, and, upon Giacobbe saying that he could not write, the agent himself signed Giacobbe's name and made a cross-mark. Later defendant asked this same agent "if she could get more insurance on her husband," and another policy was taken out, the application again being executed by the agent by making a cross-mark and signing Giacobbe's name. Two policies were also written on Giacobbe's life at the request of one Paul Petrillo upon his false representation that Giacobbe was his uncle; they named Petrillo as beneficiary, the applications being executed by the agents signing Giacobbe's name. Petrillo, who conducted a tailor shop in the immediate neighborhood of the Giacobbe home, was an intimate friend of defendant; she admitted that she had meretricious relations with him both before and after her husband's death.

In a signed statement made by defendant in the office of the district attorney, where she had been surrendered by her attorney for questioning, she stated that about two months before her husband died Petrillo had told her he was going to "fix" him, and would marry her upon the death of his wife, who was an invalid. She admitted that by "fix" she understood he was going to kill her husband, but at the trial testified that she "thought it was a joke."

Giacobbe suffered from diabetes for many years, but on or about March 23, 1933, he became acutely ill. It

was not until a week later, on March 30th, that defendant sent for a physician, Dr. Pescatore. The doctor found Giacobbe in great distress, gave him a hypodermic of morphine "to quiet him down," and told defendant he thought he ought to come back the following day because her husband "looked very ill." She told him not to return, that she would call him if she thought it necessary. Three days later, on April 2nd, he and several other physicians received emergency calls, but upon arrival at the house they found Giacobbe dead. As Doctor Pescatore emerged from the room where Giacobbe lay, defendant took him aside and asked for a death certificate. On that very night she notified one of the insurance agents of her husband's death, and shortly thereafter the necessary proofs were executed and the insurance money was collected by her and Petrillo on their respective policies. Although by that time, at least, she had knowledge that Petrillo, pretending to be a nephew, had placed insurance on her husband's life, she made no objection or comment.

A couple of weeks after Giacobbe's death Petrillo brought to defendant's house one Morris Bolber, a self-proclaimed faith healer who professed having the power to drive away evil spirits. Defendant told Bolber that she could not sleep at nights as she always saw her husband "coming after her." Bolber said: "He is not coming; he is dead. The only thing, your conscience bothers you and therefore you think he is coming," to which she made no reply.

Defendant testified that the first time Petrillo told her he had killed her husband was about two months after Giacobbe's death. When asked as to the means he had employed she said she "thought he must have given him something."

Before defendant was formally arrested or charged with murder, but after being interrogated in the office of the district attorney, she was granted, at her request, permission to visit her home. While there she twice

tried to commit suicide, once by swallowing creolin and immediately thereafter by trying to shoot herself.

Although some of the testimony hereinbefore summarized was, of course, explained or denied by defendant, the evidence in its totality was such as to prevent the withdrawal of the case from the jury. Facts which individually are not of controlling importance may, when cumulated, lead to probable or even well-nigh inevitable inferences, since each incriminating fact brings not merely additional but often multiple weight to the conclusion which it tends to establish. Here we have a variety of motives for the murder arising from defendant's lack of affection for her husband, her relations with Petrillo, his desire to marry her, and the insurance which they carried on Giacobbe's life. We have also the element of constant opportunity for the commission of the crime by Petrillo and its facilitation by defendant. We have Petrillo's announced intention of "fixing" Giacobbe and his subsequent statement that he had carried out that intention. We have the fact that, although defendant was told by Petrillo of his purpose, she continued her association with him; also that, while she had every reason to believe or at least gravely suspect that her husband's acute pains and distress were due to Petrillo's handiwork and not to the chronic diabetes, she not only did not procure medical aid until a week after his serious illness began, but even then, in disregard of the doctor's advice, would not permit him to call again, and it was not until her husband finally collapsed that physicians were summoned. We have also her subsequent incriminating conduct, such as her callous behavior (see *Commonwealth v. Karmendi*, 328 Pa. 321, 337, 195 A. 62, 68), her immediate request for a death certificate, her unseemly haste, manifested on the very day of Giacobbe's death, to collect the insurance, her sleeplessness and delusional fears regarding the "coming" of her dead husband, and her silence when charged by Bolber with having a guilty conscience. We

have the further fact that when, some two months after her husband's death, Petrillo expressly told her that he had murdered him, she made no attempt to notify the authorities or to bring Petrillo to justice. Finally, we have her suicidal attempts six years later when discovery occurred and prosecution was imminent. While none of these facts was, of course, conclusive, the jury could properly conclude that, in combination, they were not only "consistent with and pointed to the guilt of the accused but were inconsistent with her innocence."

One of defendant's assignments of error is directed to the admission in evidence of her attempts at suicide. While the probative value of such evidence has apparently never come before a Pennsylvania court for consideration, there is a unanimity of decision in other jurisdictions[2] that it is admissible on the same theory as flight, or manifestations of mental distress, fear, nervousness or excitement on the part of one charged with crime. The learned trial judge charged the jury that they might give to this testimony, in connection with all the other facts and circumstances of the case, whatever weight they, in their discretion, thought it deserved, because an attempt to commit suicide under a given set of circumstances might or might not indicate a consciousness of guilt. In this there was no semblance of error.

---

[2] *State v. Jaggers*, 71 N. J. L. 281, 58 A. 1014; *People v. Duncan*, 261 Ill. 339, 103 N. E. 1043; *State v. Painter*, 323 Mo. 314, 44 S. W. 2d 79; *State v. Lawrence*, 196 N. C. 562, 146 S. E. 395; *State v. Exum*, 213 N. C. 16, 195 S. E. 7; *People v. Barrett*, 22 Cal. App. 780, 136 P. 520; *State v. Bittner*, 209 Iowa 109, 227 N. W. 601; *State v. Blancett*, 24 N. Mex. 433, 174 P. 207. The case of *State v. Coudotte*, 7 N. Dak. 109, 72 N. W. 913, contains a discussion that is contra to these authorities, but the facts are distinguishable. Daniel Webster, in his famous argument for the prosecution in the Knapp case, said that *"suicide is confession"* (2 Wigmore on Evidence, 3d ed., section 276 (f), p. 118.) See also Underhill's Criminal Evidence, 3d ed., section 202, pp. 280, 281; section 502, p. 714; 20 Amer. Jur., section 290, p. 272.

Complaint is made that Dr. Wadsworth was permitted to express an opinion that the deceased died from arsenic poisoning, although his opinion was founded wholly upon the report of the chemist Dr. Burke. In *Commonwealth v. Petrillo,* 338 Pa. 65, 92, 93, 12 A. 2d 317, 330, 331, upon which defendant relies, the opinion given by an expert as to the cause of death was based upon his reading of stenographic notes the contents of which were not disclosed. In the present case Dr. Burke testified to his findings. They led to the almost inescapable conclusion that Giacobbe's death was due to arsenic poisoning.

It is objected that one of the heads of the chemical company which supplied the embalming fluid used on Giacobbe's body, although he did not pretend to be qualified as a chemist or himself to have made an analysis, was nevertheless allowed to testify that the fluid at that time was of the same composition as that now in use by the company. While this witness stated that the formula was a secret, he gave the principal ingredients and testified that the preparation contained no arsenic. One of the city chemists who made an analysis of the fluid as now used found that there was no arsenic in it, and certainly it is reasonable to assume that one in authority in the business would know whether his company had used the same kind of fluid during the past few years, and also, in general, the elements which composed it.

Defendant contends that it was improper to admit evidence regarding the policies of insurance taken out by Petrillo on Giacobbe's life as it was not shown that defendant knew of them until after her husband's death. The whole theory of the Commonwealth's case was that defendant and Petrillo were acting in concert in the perpetration of the crime and were actuated by the same motives. It was proper, therefore, to show that when she learned that Petrillo had taken out such insurance she made no protest, objection or comment, even though,

as she was informed, he had falsely represented himself to be her husband's nephew, but, on the contrary, she joined with him in executing the proofs of their claims. In connection with such testimony it was obviously necessary to show that Petrillo had originally taken out two of the policies.

It is true, as defendant asserts, that mere knowledge of the perpetration of a crime does not involve responsibility for its commission, nor does silence following such knowledge make one an accomplice or an accessory after the fact: *Commonwealth v. Loomis*, 267 Pa. 438, 444, 110 A. 257, 258, 259; *Commonwealth v. Mazarella*, 279 Pa. 465, 472, 124 A. 163, 165; *Commonwealth v. Guild*, 111 Pa. Superior Ct. 349, 352, 353, 170 A. 699, 700. The learned trial judge so instructed the jury, but the evidence justifies a finding that there was more than mere connivance on the part of defendant. The jury might have concluded, and evidently did conclude, that she and Petrillo had criminal intent and community of purpose, and that, with knowledge of Petrillo's designs, she deliberately expedited their execution by withholding from her husband the medical aid which it was her duty to furnish him.

One of defendant's grievances is that the district attorney did not produce, as part of the Commonwealth's case, a statement made by Petrillo which, if believed, would have exonerated defendant from complicity in Giacobbe's death, and also that he failed to put in evidence hospital records showing the treatment for diabetes given to Giacobbe as an outpatient at a hospital. Apart from the fact that Petrillo testified in person on behalf of defendant, there is no rule of law or practice which imposes the duty upon the district attorney to call as a witness every one whom counsel for a defendant may suggest for that purpose, especially where the defendant is given notice, or otherwise has knowledge, that it is not the intention of the district attorney to call such witness: *Commonwealth v. Danz*, 211 Pa.

507, 522, 60 A. 1070, 1075; *Commonwealth v. Kara-markovic*, 218 Pa. 405, 408, 67 A. 650, 651; *Commonwealth v. Deitrick*, 221 Pa. 7, 14, 15, 70 A. 275, 277, 278; *Commonwealth v. Zec*, 262 Pa. 251, 256, 105 A. 279, 281. Although the district attorney is a quasi-judicial officer and as such should be motivated by a desire to accomplish justice rather than by an inordinate zeal to obtain convictions, much must be left to his discretion, under the general direction of the trial judge, in regard to the calling of witnesses for the Commonwealth.

In *Commonwealth v. Petrillo*, 338 Pa. 65, 12 A. 2d 317, a conviction of murder in the first degree in an arsenic poisoning case was reversed because of the admission of evidence concerning other arsenic poisonings to which considerable attention was directed throughout the course of the trial. Defendant objects that similar references were made in the present case, especially in the interrogation of one of the witnesses by the district attorney, but a careful reading of the record fails to disclose any justification for this complaint, the questions referred to being necessary to show how the witness, as assistant district attorney, came to obtain the information as to which he testified, and being, in their import, wholly innocuous. Nor is there any greater merit in defendant's charge that the court erred in permitting the district attorney, in his opening address to the jury, to discuss the general value of circumstantial evidence. It is not contended that the law was erroneously stated or that defendant was in any way prejudiced; moreover the record does not indicate that counsel requested the court to have the contents of the address made a part of the record: *Commonwealth v. Del Vaccio*, 299 Pa. 547, 553, 554, 149 A. 696, 698, 699; *Commonwealth v. Flori*, 300 Pa. 125, 130, 131, 150 A. 290, 291, 292.

The trial judge told the jury that in his opinion there was no room, under the evidence, "for any middle ground," but only for a verdict either of guilty of mur-

der in the first degree or of not guilty. In this there was no error, because he coupled this expression of opinion with a clear statement to the jury that they were not to be controlled by it, since they alone had the right to fix the degree of the crime: *Commonwealth v. Ronello,* 251 Pa. 329, 337, 338, 96 A. 826, 829; *Commonwealth v. Spardute,* 278 Pa. 37, 50, 51, 122 A. 161, 166; *Commonwealth v. Edwards,* 318 Pa. 1, 5, 6, 178 A. 20, 22.

The jury found defendant guilty of murder in the first degree but did not return a verdict on the manslaughter indictment upon which also she was being tried. It is difficult to see how this was harmful to her, since the verdict on the murder bill necessarily disposed of the indictment for manslaughter, which may therefore be nolle prossed. It was said in *People v. Follette,* 74 Cal. App. 178, 207, 240 P. 502, 514: "Our attention has not been directed to any authority which holds that where a defendant is upon trial on two or more indictments and the jury renders a verdict of guilty upon the charge contained in one of said indictments, and fails to render any verdict upon the charge contained in the other indictment, that such failure of the jury to render a verdict upon one indictment affects in any manner whatever the verdict rendered upon the other of said indictments."

Defendant sought a new trial on the ground of after-discovered evidence that Dr. Pescatore, the physician who was called in to treat the deceased on March 30, and who testified that he prescribed no medicine for him, did in fact write a prescription, which was actually filled and given to the deceased. It is alleged that this information could not have been obtained during or previous to the trial. However, the prescription, as now produced, was only for a mild sedative and contained no arsenic or other poison. At best, therefore, the proposed evidence could serve only to impeach the credibility of the witness, and consequently would furnish

no reason for the granting of a new trial: *Commonwealth v. Carter*, 272 Pa. 551, 555, 116 A. 409, 410; *Commonwealth v. Elliott*, 292 Pa. 16, 24, 140 A. 537, 540; *Hornick v. Bethlehem Mines Corporation*, 310 Pa. 225, 228, 165 A. 36, 37; *Commonwealth v. Moskovitz*, 142 Pa. Superior Ct. 325.

This case was tried with extreme care, the rulings on evidence and the charge of the trial judge were free from error, and the verdict rendered by the jury is conclusive.

All the assignments of error are overruled, and the judgment and sentence thereon are affirmed.