Commonwealth *v.* Horn, Appellant.

586

Argued November 21, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

*Louis Lipschitz,* for appellant.

*Domenick Vitullo,* Assistant District Attorney, with him *Juanita Kidd Stout,* Assistant District Attorney, *James N. Lafferty,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, March 16, 1959:

Defendant was found guilty by a trial Judge, sitting without a jury, of operating a motor vehicle while under the influence of intoxicating liquor. The Judg-

ment and Sentence of the Court of Quarter Sessions was affirmed by a unanimous Superior Court, and this Court allowed an allocatur.

On January 22, 1957, at approximately 1:00 a.m., John McKnight was driving his automobile accompanied by his wife and three children, south on A Street in Philadelphia. A Street is a one-way street south. Defendant was driving his automobile west on Clearfield Street—the wrong way on a one-way street. When McKnight's automobile was half-way across the intersection of A Street and Clearfield Street, it was struck on the left rear side by the front of an automobile driven by defendant. Defendant knocked McKnight's automobile completely around and his three children were thrown into the street; his car ended up on the west side of the pavement about 25 yards down A Street.

Officer Kinsella arrived at the scene of the accident very shortly after it occurred. After McKnight and his wife and their children, who were bleeding very badly, were placed in a patrol car to be taken to the hospital, the officer asked defendant where he thought he was going. Defendant did not answer the question. Officer Kinsella testified that defendant had the odor of alcohol on his breath, "that his face was kind of bloated, like, and his eyes looked kind of funny".

Officer Hinchcliffe arrived at the scene of the accident about 1:30 to investigate the accident. He interrogated defendant at 2:15 a.m. when defendant was in the cell block of the 30th District Station. Hinchcliffe testified that defendant "had an odor of alcohol on his person, his face was flushed, his eyes blood-shot and his speech was thick, and he was under the influence of intoxicating liquor". He further testified that defendant told him that he knew he was on a one-way street, but did not know he was going the wrong way

because he was not familiar with the neighborhood, although he said he traveled this route home every night on his way back to his home at Levittown; that he was going about 15 to 18 miles an hour, and that he saw McKnight's car when he was about 30 feet from the intersection of A Street, and put on his brakes but could not stop. Defendant also said that it was a misty, foggy night. Notwithstanding this fact, the weather report showed that visibility was good for an entire city block.

Defendant took the witness stand and told what the trial Judge described as a "cock-and-bull story", a story that "reflected not only a lack of candor but almost improvisation as the case went along . . . in weighing the testimony of the witnesses the Court's observation of defendant's demeanor led it to reject his testimony as unworthy of belief." A reading of the record amply supports the trial Judge's finding that defendant's testimony was unworthy of belief.

Defendant seeks a new trial for two main reasons: (1) the testimony of the police surgeon which was favorable to him, and (2) the statements of the trial Judge which he contends were so prejudicial as to deny him a fair trial.

When the Commonwealth concluded its case, the District Attorney announced there were two other witnesses named on the bill of indictment—John McKnight, an ill child aged 6, and Dr. Squillace, the police and fire surgeon, who examined defendant at about 2:30 or 2:35 a.m. The District Attorney then stated that the Commonwealth "does not choose to call Dr. Squillace but he is available to either the Court or the defendant". Defendant then requested the Court to direct the District Attorney to call Dr. Squillace and the Court directed the Commonwealth to call him. Assuming, arguendo, that this was error, the error was

prejudicial to the Commonwealth, not to the defendant.

There is no duty on the Commonwealth to call witnesses whose names appear on a bill of indictment or even eye witnesses, if it believes after examination or investigation that their testimony is unreliable, or unworthy of belief, or surplusage or irrelevant. The law in such a case merely requires a District Attorney to notify the Court and defense counsel that he does not intend to call certain persons whose names appear on the bill of indictment as Commonwealth witnesses: *Commonwealth v. Palermo*, 368 Pa. 28, 81 A. 2d 540; *Commonwealth v. Deitrick*, 221 Pa. 7, 14, 15, 70 A. 275. See also: *Commonwealth v. Danz*, 211 Pa. 507, 522, 60 A. 1070; *Commonwealth v. Giacobbe*, 341 Pa. 187, 195, 19 A. 2d 71.

In *Commonwealth v. Palermo*, 368 Pa., supra, the Court sustained the refusal of the District Attorney "to . . . call the only eye witness to the shooting". The Court said (pages 32-33) : "It is a settled principle of law that the Commonwealth must try a case fairly and that the district attorney is not a 'vindictive seeker for vengeance.' Commonwealth v. Karamarkovic, 218 Pa. 405, 408; 67 A. 650 (1907). However, it is equally well established that the district attorney is not obliged to call all of the eye witnesses, 'nor a particular eye witness where he has reason to believe that the witness is unreliable.' Commonwealth v. Thurman, 167 Pa. Superior Ct. 642, 647, 76 A. 2d 483 (1950). The calling of witnesses is within the discretion of the district attorney under the general supervision of the trial judge: Commonwealth v. Karamarkovic, supra; Commonwealth v. Deitrick, 221 Pa. 7, 14-15, 70 A. 275 (1908); Commonwealth v. Giacobbe, 341 Pa. 187, 196, 19 A. 2d 71 (1941) . . . ."

After Dr. Squillace was sworn, the trial Judge took over his examination. Dr. Squillace testified that defendant had an odor of alcohol about him but it was not very strong, his face was slightly flushed but there was no evidence of any staggering gait; he was well dressed and well oriented. Defendant's temperature and pulse rate were normal. Defendant stated to him and to others that he had had two or three glasses of beer at 7 o'clock that night. Dr. Squillace then testified that in his opinion defendant was not under the influence of intoxicating liquor "to such an extent that he was not fit to drive an automobile safely in traffic." This is not a sufficient or all-inclusive test to absolve defendant.

The statute does not require that a person be drunk, or intoxicated, or unable to drive his automobile safely in traffic, but merely that the Commonwealth prove beyond a reasonable doubt that defendant was operating his automobile while under the influence of intoxicating liquor. It is very difficult to define "drunk", or "intoxicated" or "under the influence of intoxicating liquor". Intoxication is a matter of common observation and knowledge, and because of observation, knowledge or experience, the opinions of laymen are admissible and medical opinion, while of course admissible, is not required: *Commonwealth v. Eyler,* 217 Pa. 512, 66 A. 746; *Commonwealth v. Smith,* 174 Pa. Superior Ct. 533, 102 A. 2d 243; *Turner v. Penna. Liquor Control Board,* 161 Pa. Superior Ct. 16, 53 A. 2d 849.

The statutory expression "under the influence of intoxicating liquor" includes not only all the well known and easily recognized conditions and degrees of intoxication, but also any mental or physical condition which is the result of drinking alcoholic beverages and (a) which makes one unfit to drive an automobile, or (b) which substantially impairs his judgment, or clear-

ness of intellect, or any of the normal faculties essential to the safe operation of an automobile. Cf. *Commonwealth v. Smith*, 174 Pa. Superior Ct. 533, 102 A. 2d 243; *Commonwealth v. Schutzman*, 169 Pa. Superior Ct. 72, 82 A. 2d 317; *Commonwealth v. Phillips*, 169 Pa. Superior Ct. 64, 82 A. 2d 587; *Commonwealth v. Buoy*, 128 Pa. Superior Ct. 264, 267, 193 A. 144.

Courts cannot say *as a matter of law* how many drinks an individual can take without becoming under the influence of intoxicating liquor. The reasons for this are so well known as not to require recitation.

Defendant complains that the trial Court committed reversible error in examining or cross-examining Dr. Squillace, although he requested the Court to order the police surgeon to be called by the District Attorney and took no exception to his examination by the Court. In *Commonwealth v. Watts*, 358 Pa. 92, 56 A. 2d 81, the Court said (page 96): "It is always the right and sometimes the duty of a trial Judge to interrogate witnesses, although, of course, questioning from the bench should not show bias or feeling nor be unduly protracted." See also: *Commonwealth v. Myma*, 278 Pa. 505, 123 A. 486; *Commonwealth v. Del Giorno*, 303 Pa. 509, 154 A. 786.

Dr. Squillace's testimony was exceptionally favorable to defendant, so it is obvious, for each of the above mentioned reasons, that there is no merit in this contention.

Defendant also is in error in treating the evidence in the light most favorable to himself. "Defendant, like most defendants, proceeds on the assumption that a part of or none of a defendant's [or a witness's] statements, confessions or testimony": *Commonwealth* you must believe all of his statements or confessions; of course, that is erroneous; a jury can believe all or *v. Homeyer*, 373 Pa. 150, 153, 94 A. 2d 743.

The trial Judge based his findings, conclusions and decision to a large extent on the credibility of the witnesses whom he saw and heard; he believed the Commonwealth's witnesses* but did not believe Dr. Squillace or the defendant; and on this basis the evidence was sufficient to justify the verdict of the trial Judge.

Defendant further contends that he was deprived of a fair trial by the manner and statements of the trial Judge. Judge WOODSIDE, speaking for a unanimous Superior Court, aptly said: "It is customary for arguments by counsel directed to a trial judge sitting without a jury to be far less formal than the arguments made to a jury. The trial judge frequently enters into a discussion with counsel concerning both the facts and the law. The informality of these arguments, through the discussion method, not only saves time, but also frequently enables the counsel to discover the court's predilections on particular issues. This gives counsel an opportunity to direct the trial judge's attention to evidence which he may have overlooked on such issues, to argue reasons for the trial judge to believe or disbelieve certain evidence bearing on them, and to emphasize reasons why the court should draw favorable inferences from certain evidence. This, it seems to us, is an advantage to the defendants which would be lost to them if trial judges were required to avoid stating their thoughts during an argument made after all the evidence had been presented . . . ."

Without discussing in detail the statements of the trial Judge which defendant believes were highly preju-

---

* The trial Judge, because he believed he did not permit adequate cross-examination, did not consider the testimony of McKnight, who testified defendant staggered as he got out of his car, or the testimony of Officer Garvin who testified that as he picked up McKnight's children he noticed a very strong odor of alcohol on defendant's breath.

dicial, it will suffice to say that several of them appear to be too impulsive, unwise and lacking in judicial restraint, but they were not sufficient to warrant a new trial on the ground of bias or prejudice or a violation of defendant's Constitutional right to a fair trial.

The Judgment of the Superior Court affirming the Judgment and Sentence of the Court of Quarter Sessions of Philadelphia County is affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

There can be no question in my mind that the Defendant in this case is entitled to a new trial. I have known the Trial Judge for a long time and I have a high regard for him personally. I respect his ability and his zeal for righteousness, but in this case, as I see it, he allowed zeal to becloud judgment and eagerness to displace thoroughness.

Section 2 of the jury-waiving law (Act of June 11, 1935, P. L. 319) says of the judge that he "shall have jurisdiction to hold the trial and shall proceed to hear, try and determine all issues of law and fact, and to render a general verdict in like manner as if the defendant had put himself upon the inquest or country for trial, and *his cause were being tried before a jury . . .*"*

In the case of *Commonwealth v. Richman,* 132 Pa. Superior Ct. 529, 531, the defendant was being tried on the charge of receiving stolen goods. The Judge, who was sitting without a jury, declared at one stage of the trial: "I do not understand counsel or defendants in this case. If you want me to sit as a judge and jury and ask me to believe testimony like that you are making a big mistake. I am telling all of you that. Think of it, a boy like that walks into a pawnshop and a transaction takes place and you want me to believe

---

* Italics throughout, mine.

the man did not know it was stolen." The Judge returned a verdict of guilty and the defendant appealed. The Superior Court properly reversed. Judge RHODES (later President Judge), in a very able and courageous opinion, said: "Appellant, as a defendant in a criminal action, was entitled to the usual safeguards and to have all the evidence considered by the trial judge before his guilt or innocence was determined. The presumption of innocence of the accused continued in his favor throughout the entire case (see Com. v. Barrish, 297 Pa. 160, 171, 146 A. 553) and whether it was overcome was to be determined by the trial judge after the introduction of all the evidence. The testimony of the last witness in a criminal case may be enough to raise a reasonable doubt as to a defendant's guilt. The trial judge clearly indicated in the midst of the trial that he had determined that appellant was guilty. *The premature conclusion of the trial judge constitutes reversible error."*

The Trial Judge in this case also seems to have anticipated a verdict of guilty. During the defendant's testimony the District Attorney objected to a question put by defense counsel, whereupon the Judge said to the District Attorney: "I wouldn't worry about it. I will give him wide latitude, because there is a very strong case against him. He can answer it."

Over and over judges tell juries that they are not to form an opinion on the guilt or innocence of the defendant until after they have heard *all* of the evidence and have listened to the charge of the Court. A judge in a non-jury case has no more liberties in this respect than a jury.

Was the Trial Judge disposed toward the prosecution's side of the case even before the defendant opened his case? The police surgeon, who examined the defendant on the night of his arrest, testified that he

found the defendant's pulse normal, his temperature normal, and that his pupils reacted to light and accommodation. He said further: "There was no evidence of any staggering gait. His face was somewhat flushed, slightly flushed. He was oriented, well dressed; his clothing was neat. I did ask him how many drinks he had, and he claimed he had two glasses of beer." He said also that the defendant had an odor of alcohol about him but that it was "not very strong." He added: "I did speak to him, just a matter of a few questions to see whether the man was oriented and if he knew where he was, and I do not think there was any question in my mind about it, that he was oriented."

This caused the Trial Judge to say "Do not say you do not think there is any question in your mind. That is absolutely meaningless. We will ask is there any question in your mind when the time comes."

But was the answer of the doctor meaningless? He examined the defendant, talked to him, and concluded (there was no question in his mind about it) that the defendant was oriented. The answer, however, displeased the Judge. All the doctor's testimony seemed to displease the Judge. When defense counsel asked the doctor: "You apparently talked to him and received intelligent answers", and the doctor replied: "Yes, he knew where he was. As a matter of fact, I will even go further—", the Judge said: "Never mind; don't go any further. Stay where you are. Just answer questions."

The doctor definitely stated that in his opinion the defendant "was mentally and physically able to drive his automobile carefully." Despite this positive statement by the doctor, the Judge said on three different occasions that the doctor testified that the defendant was under the influence of liquor. The doctor did not

so testify. The testimony on that subject was as follows: "Q. What was your opinion? A. The opinion was that the man had a few drinks, but he had not had enough drink to the point where he was not able to drive a vehicle safely in traffic. That was my opinion. Q. Was or was not your opinion at the time that he was not under the influence of intoxicating liquor to such an extent where he was not fit to drive an automobile? A. That is correct. Q. As a result of your examination, would you say that he had clearness of intellect, which makes for proper mental and physical coordination? A. Yes, I do. Q. Would you say he was mentally and physically able to drive his automobile carefully? A. Yes, I do."

The Trial Judge's disregard of the evidence presented by the police surgeon, an obviously impartial witness, constituted, in my estimation, an abuse of discretion. He said that he could not accept the doctor's testimony because "he was too gratuitous." What does this mean? The doctor examined the defendant in the official discharge of his official duties as a police surgeon. There is no suggestion that he was motivated by any desire to betray the police department or to help the defendant. He testified to what he did and knew.

Since the doctor did not say that the defendant was under the influence of intoxicating liquor, even though he had had a "few drinks," the Judge announced a standard of his own as to what constitutes a "drink." "What is a drink? If you get a drink in some of these hotels, you just get a little bit of alcohol from the bartender's fingers, but they still call it a drink. If you get a drink some place else, you get a big snort. They are both drinks."

Did the Judge find the defendant guilty of driving a car under the influence of intoxicating liquor on the

supposition that he had had two "big snorts"? We are unable to say, but we cannot exclude that possibility, and if it be so, would the verdict be sustainable on the record?

The defendant testified that on the night of his arrest, the city was blanketed with a heavy fog and, because of poor visibility, he came into collision with another automobile. In relating how the accident occurred he said that he was adhering to a certain route in endeavoring to reach his home, but that, at a certain point, he decided to take another route, one with improved visibility. The Trial Judge saw something sinister in the fact that the defendant changed his mind about the route: "That cock-and-bull story of driving blind at 12 o'clock at night as he turned into Allegheny Avenue, and he said himself on the witness stand that he knew Aramingo Avenue was lower and would be more foggy, and he was going over there. He was pressed. There is one way of telling the truth, but there are a half dozen ways of telling an untruth or half truths. I can understand the mental processes, but it seems to me that a more frank statement here would be better. Whom is he fooling? He is able to talk, he has the power of expression, he knows how to do it, and he was giving a cock-and-bull story in final desperation. I watched him. He said, I changed my mind. That is the resort to flight. He was fleeing from his own previous expression—to paraphrase, you might say the guilty flee their statements when no man pursueth."

The last sentence in the Judge's expostulation was a neatly turned sentence. It was clever and witty. His application of a biblical quotation to a present-day event was adroit. The re-arrangement of the words was astute. But as an expression of judicial impartiality, it left much to be desired. Why didn't the de-

fendant or any driver have the right to change his driving direction if he thought (even mistakenly) that he would find less fog over the new route? Why wouldn't he have the right to change his mind in any event? There is no law against one changing one's mind.

At the termination of the taking of testimony, defense counsel rose to address the Court in behalf of his client. A glance at the printed record will reveal that he never really got a chance to plead his cause. The Judge so constantly interrupted him that the supposed summation became a debate—a debate which could be likened to an argument between a prize fighter and the referee, with the outcome as readily foreseeable as the referee's decision.

The attempted summation is spread over eight pages in the record. Practically one-half of that space is taken up with the Judge's interruptions, interpolations, acidulous observations, and uncomplimentary references to the police surgeon, the defendant, and an unknown "somebody" who "fell flat on their face." On the night of the arrest, the defendant's car collided with the car of one John McKnight. It appears that Mr. McKnight's three children in the car were injured (the extent of the injuries does not appear in the record). During defendant's counsel's attempted speech, the Judge broke in to say: "There is only one thing I dislike, after the determination, why wasn't he indicted for aggravated assault and battery on these three little children? That is what he should have been indicted for. Somebody fell flat on their face. They made out a true case of aggravated assault and battery. Here is, in my opinion, an open and shut case of aggravated assault and battery."

When defense counsel sat down the District Attorney rose, spoke twelve lines and then said: "I have

nothing further to add." He used excellent judgment. He had already been told by the Judge in the midstream of trial that he (the District Attorney) had presented a "very strong case" against the defendant. Why gild the lily? Why embellish the obvious? Why delay the inevitable judgment peeping over the horizon? He quickly sat down and the Judge quickly announced: "The verdict is guilty."

I presume no one gasped in surprise in the courtroom. Defense counsel immediately moved for a new trial. The Judge informed him he would hear argument "a week from now in this room." Defense counsel asked for a delay, whereupon the Judge said: "Then, withdraw your motion. It is an open and shut case. There isn't an error on the record."

The Judge undoubtedly conscientiously believed there was not an error on the record and my colleagues here apparently also so believe, but my belief is a contrary one.

I would grant a new trial.