419 A.2d 643

**COMMONWEALTH of Pennsylvania**

v.

**James J. ARIZINI, Appellant.**

Superior Court of Pennsylvania.

Argued March 19, 1979.

Filed April 3, 1980.

28

30

Robert J. Edelmayer, Norristown, for appellant.

Janet L. Crawford, Assistant District Attorney, West Chester, for appellee.

Before PRICE, SPAETH and LIPEZ, JJ.

SPAETH, Judge:

Appellant was convicted by a jury of driving under the influence of liquor. Act of April 29, 1959, P.L. 58, § 1037, 75 P.S. § 1037, *repealed by* the Act of June 17, 1976, P.L. 162, No. 81, § 7 (effective July 1, 1977).[1] On appeal the principal issue is whether the evidence was sufficient to support the conviction.

At trial the Commonwealth produced five witnesses. Their testimony may be summarized as follows.

On December 31, 1976, appellant and Bill Hawley went to Bruce Cassidy's home between 9:00 and 10:00 p. m. After some discussion, Cassidy, Hawley, appellant, and Mark Lucas (who was also at Cassidy's home) left in two cars for a friend's house approximately five minutes away. Upon arrival, the four deliberated for twenty minutes whether to go inside the friend's house, decided not to, and left for the house of Ted Martin, another friend. They arrived at Martin's between 10:30 and 11:00 p. m. and went inside for a few drinks. Appellant brought a six-pack of beer and some champagne. At approximately 12:30 a. m., Cassidy and Hawley left with appellant to go to the Valley Forge Sports Garden, a five minute drive away. Appellant was driving an Opel Manta, a sportscar. As appellant was proceeding

1. This offense is now codified at 75 Pa.C.S.A. § 3731 (1977).

along Swedesford Road, Cassidy warned him that they were nearing a sharp "S" turn in the road, and asked appellant to slow down. Appellant did slow down, but as he entered the first part of the turn (consisting of a sloped 45 degree curve) the car skidded sideways on a patch of ice on the roadway, hit a guardrail, and was torn in half. Cassidy stated that based upon his observations on the night of the incident, appellant was not under the influence of liquor; he was not stumbling and did not have difficulty talking. Cassidy also stated, however, that he definitely saw appellant drink one sixteen–ounce can of beer and a glass of champagne before the accident, although, he said, he was not "studying" appellant during this time.

James Carbo, an officer in the Tredyffrin Township Police Department, arrived at the scene of the accident at approximately 12:25 a. m. He observed a car that had been driven off the road into a guardrail and had been torn into two sections. The road was dry except for small patches of ice where the accident occurred. Hawley had been thrown out of the car and was lying along the guardrail. Appellant had a laceration on his head. When Carbo asked appellant whether he needed first aid, appellant indicated that he was mainly concerned over his passengers' well–being. Although it was zero degree weather and the wind was blowing, appellant, who was dressed only in a shirt and slacks (having given his heavy coat to Hawley), complained neither of the cold nor his injury. Carbo stated that appellant appeared to be slightly confused and extremely excited, but that these symptoms were quite common in persons involved in serious automobile accidents. Carbo also stated that appellant had no difficulty in holding a conversation, and talked with people who were at the scene. Although Carbo noticed the odor of alcohol on appellant's breath, and had "concentrated sight" of appellant for five minutes, Carbo had no opinion based upon his observations as to whether appellant was under the influence of liquor.

James Pierson, Traffic Safety Officer on the Tredyffrin Township Police Department, responded to a call that an

accident had occurred on Swedesford Road. Upon discovering several empty sixteen--ounce beer cans in appellant's car, Pierson proceeded to the emergency room of the Paoli Hospital, where appellant and his passengers had been taken for treatment. After speaking with appellant, Pierson asked that he consent to a blood alcohol test. Appellant signed a consent form, and blood was drawn. Pierson, who observed the drawing of blood, described the procedure as follows. At approximately 2:42 a. m., a laboratory technician washed appellant's arm with a soap and water solution, tied a band around the arm, and drew two tubes of blood. The technician then labeled the tubes and signed a custody form showing that the tubes were given to Pierson. Pierson took the tubes, wrote his initials and the date on them, and placed them in his coat pocket. Pierson then drove appellant and Cassidy to their homes, went to the police station, and called Upjohn Clinical Laboratories to make arrangements to deliver the tubes to the laboratories. When told that no one was present at the laboratories to receive the tubes, Pierson went home and placed both tubes in his refrigerator sometime between 3:00 and 4:00 a. m. On January 2, Pierson called the laboratories again, and was informed that he could deliver the tubes the next day. On January 3, he delivered the tubes to an employee of Upjohn Laboratories. To Pierson's knowledge, no one touched or tampered with the tubes while they were in his refrigerator (indeed he said his wife and children were "petrified" that he was keeping human blood in the refrigerator), and no power shortages occurred. Pierson also testified that he observed appellant for an hour at the hospital, and during this time appellant was alert, sitting up straight, conversing intelligently, not vomiting, and not stuporous. Although Pierson smelled the odor of alcohol on appellant's breath, he formed no opinion as to whether appellant was under the influence of liquor. Pierson did not conduct field tests on appellant to determine his sobriety, and was "shocked" when he learned the high alcohol reading of the tests performed on the blood samples.

Elizabeth Spratt, a laboratory technician at Upjohn Laboratories, received the blood samples from Pierson. Upon receipt, she placed the samples in the toxicology refrigerator in a locked compartment to which only five technicians had access. Spratt tested the samples herself, and described in detail the methodology used. The salient facts are that she set up the test twice, that the results correlated well, that the tests were set up separately from her other work, that the standard solution used in the tests was checked every month even though the solution was good for six months, that the machine on which the tests were made was serviced every three months, and that she could not have tested the wrong samples because in recording the results she relied on the information that had been placed on the tubes themselves. Spratt had not received any complaints at Upjohn Laboratories concerning human error in specimen testing, and her results were checked by her supervisor, Dr. Phillips. Her tests indicated that the blood samples given to her by Pierson contained .275% alcohol by weight. When asked what symptoms a person the size of appellant would show with this amount of alcohol in his bloodstream, Spratt replied that he "should maybe be more relaxed than normal," that his "walking patterns might be altered," "[h]is speech might be altered," "[h]is ability to focus might also be changed . . . ." Spratt acknowledged, however, that she lacked personal experience regarding the symptomatology of inebriated persons, her experience being limited to laboratory work except for "a few movies that show giving people increments of alcohol and then having a driving test." Spratt testified that prolonged exposure to room temperature will increase the alcoholic content of blood samples, and that if someone carried a sample close to his body for several hours, a breakdown in the blood composition might occur.

Dr. Richard N. Phillips, head of the toxicology and endocrinology section of Upjohn Clinical Laboratories, reviewed Spratt's test results and found them to be accurate. He testified that based upon the facts adduced at trial, he would not expect that the percentage of alcohol in the blood

samples had changed significantly, if at all, between the time the blood was drawn and the time it was tested. Dr. Phillips also stated that he would expect a person with a .275% alcohol concentration in his blood to exhibit such overt signs of intoxication as incoordination and an inability to enunciate clearly, and that many people would be incontinent with that amount of alcohol, and many would be in either a stupor or a comatose state. Although Dr. Phillips testified that he would have expected appellant to have exhibited these symptoms, he also testified that a small percentage of the population might not show signs of intoxication even though they had this amount of alcohol in them, and that "in most cases it is generally accepted that stress, not in terms of physical shock but shock in terms of emotional shock, might tend to increase the appearance of sobriety," although he did not believe that emotional shock would eliminate all symptoms of being under the influence of liquor.

Appellant produced one witness at trial. Stanley Broskey, a forensic scientist, testified that from his experience and training, a person approximately 155 to 160 pounds with an alcohol concentration in the bloodstream of .275% would exhibit the following symptoms:

The symptoms at point three five percent alcohol [by volume--or, .275% by weight] are as such--as follows: The suspect would be apathetic. In other words he wouldn't care what you said or asked him about. There would be a state of inertia, inertia meaning in trying to lift his limb it would seem like a ton or trying to get up, he just couldn't do it. There would be a state of tremors or trembling. There would be an inaction about the body to usual response, for example if a fly rested on his nose he wouldn't chase it off. It wouldn't mean anything. If he would have an itch, he wouldn't scratch. He would be sweating. There would be dilation of the capillaries around the skin. There would be a stupor or coma. A stupor is sort of a half coma. For example if your name is John and you were in a stupor and I would call your name,

you would most probably say "Yes" but if you were in a coma and I said "John," there would be no answer to it. A coma is a deep sleep which one cannot awaken. At a point three five—this is the state a person is in a coma.

\* \* \* \* \* \*

At that state—a point three five—this is a state of surgical anesthesia, that is you could amputate a person's limb and he wouldn't feel it. For example in the movies they show a person taking one or two drinks and then the bullet is removed but that is just the movies. You have to get at least, for that body weight, twelve shots, fourteen shots in order to get that level but once you are at a point three five a person cannot get up. He feels no pain. He cannot sign his name. He cannot respond to questions. There is none of that.

Record at 169A–170A.

Broskey also read from a manual of analytical toxicology which outlined identical symptoms. Broskey maintained that adrenaline and stress could not compensate for the level of alcohol that was supposedly in appellant on the night of the incident, and that since appellant, according to the Commonwealth's eyewitnesses, did not exhibit any of the usual signs of intoxication, laboratory error must have occurred. According to Broskey, the maximum level of alcohol that could be present in the blood when the only symptom of intoxication is an odor on the breath is .03 to .05%. Broskey admitted, however, that in rare instances a person with a .275% alcohol concentration might show an unusual tolerance to alcohol. Record at 182A to 183A. Broskey also testified that if a vial of blood were exposed to room temperature for several days, the alcoholic content in the blood might change.

■  The test in determining whether the evidence is sufficient to sustain a jury verdict "is whether, viewing all of the evidence admitted at trial in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, is it sufficient to enable the trier of fact to find every element of the crimes charged beyond a reasonable doubt?"

*Commonwealth v. Cristina*, 481 Pa. 44, 49, 391 A.2d 1307, 1309 (1978), *cert. denied*, 440 U.S. 925, 99 S.Ct. 1255, 59 L.Ed.2d 479 (1979). Our inquiry is bound by two poles. While the Commonwealth does not have to establish guilt to a mathematical certainty and may in a proper case rely wholly on circumstantial evidence, a conviction may not be based on mere conjecture or surmise. *Commonwealth v. Madison*, 263 Pa.Super. 206, 397 A.2d 818 (1979); *Commonwealth v. Navarro*, 251 Pa.Super. 125, 380 A.2d 409 (1977). Applying this test here we find the evidence sufficient.

■ To establish that appellant was guilty of driving under the influence of liquor, the Commonwealth had to prove (1) that he was operating a motor vehicle (2) while under the influence of liquor. Appellant does not contend that the Commonwealth failed to prove the first element. In determining whether the Commonwealth proved the second element, it should be recalled that

[t]he statute does not require that a person be drunk, or intoxicated, or unable to drive his automobile safely in traffic, but merely that the Commonwealth prove beyond a reasonable doubt that defendant was operating his automobile under the influence of intoxicating liquor. It is very difficult to define "drunk", or "intoxicated" or "under the influence of intoxicating liquor" . . . . .

. . . . .

The statutory expression "under the influence of intoxicating liquor" includes not only all the well known and easily recognized conditions and degrees of intoxication, but also any mental or physical condition which is the result of drinking alcoholic beverages and (a) which makes one unfit to drive an automobile, or (b) which substantially impairs his judgment, or clearness of intellect, or any of the normal faculties essential to the safe operation of an automobile.

*Commonwealth v. Horn*, 395 Pa. 585, 590–91, 150 A.2d 872, 875 (1959).

*See also Commonwealth v. Long*, 131 Pa.Super. 28, 198 A. 474 (1938).

We have related the evidence in detail because of the close issue this case presents. Had the Commonwealth's evidence demonstrated that it is impossible for a person of appellant's size not to exhibit overt signs of intoxication when his bloodstream contains .275% alcohol, then the Commonwealth's evidence would have failed under the principle that "a case should not go to the jury where the party having the burden offers testimony of a witness, or of various witnesses, which is so contradictory on the essential issues that any finding by the jury would be a mere guess." *Commonwealth v. Bartell*, 184 Pa.Super. 528, 537, 136 A.2d 166, 172 (1957). *See also Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976); *Commonwealth v. New*, 354 Pa. 188, 47 A.2d 450 (1946); *Commonwealth .v. Anderson*, 237 Pa.Super. 208, 352 A.2d 92 (1975); *Commonwealth v. Bennett*, 224 Pa.Super. 238, 303 A.2d 220 (1973); *Commonwealth v. Zeringo*, 214 Pa.Super. 300, 257 A.2d 692 (1969); *Commonwealth v. Donald*, 192 Pa.Super. 276, 161 A.2d 915 (1960); *Commonwealth v. Rex*, 147 Pa.Super. 121, 24 A.2d 98 (1942); McCormick, Evidence § 388 at 790 n.35 (Cleary ed. 1972). In such a case, the jury would have been faced with mutually inconsistent and irreconcilable evidence. On the one hand, the jury would have the testimony of the Commonwealth's eyewitnesses—two maintaining that they could not determine from personal observation whether appellant was under the influence and one maintaining that appellant was not intoxicated—and on the other hand, the jury would have the test results indicating that the alcohol concentration in appellant's bloodstream was .275% and the expert's testimony that if appellant had had this much alcohol in him, its effects would have been apparent to others. In these (imagine) circumstances, the jury would not be able to convict appellant without rejecting either the testimony of the Commonwealth's expert that it would have been impossible for appellant to hide the signs of his intoxication, or the testimony of the eyewitnesses that appellant did not appear intoxicated. However, there would be no basis for the jury to reject any of this evidence. The jury could not find that appellant appeared intoxicated on the night of the incident

when the only evidence showed that he did not appear intoxicated.[2] Nor could the jury find that a person may in some instances have a .275% alcohol concentration in his bloodstream and not show the effects when the only evidence introduced by the Commonwealth on the point established that such was impossible.[3] Moreover, there would be no basis for the jury to reconcile the evidence through findings of credibility.

■■■ Here, however, the Commonwealth's expert, Dr. Phillips, testified that although it is usual for a person of appellant's size to exhibit signs of intoxication when the alcohol in his bloodstream is .275%, a small percentage of the

2. The only symptom of intoxication that appellant exhibited after the accident, it may be remembered, was the odor of alcohol on his breath. We have held that the mere odor of alcohol is insufficient to prove that a person is under the influence of alcohol. E. g., *Commonwealth v. Stosny*, 152 Pa.Super. 236, 239–40, 31 A.2d 582, 583–84 (1943).

3. Nor, it might be added, could the jury accept the blood test as demonstrative of appellant's condition without accepting it as an accurate measure of the amount of alcohol in appellant's system. In other words, the jury could not say to itself that the blood test was wrong, that appellant's alcohol level was not .275%, but that the test nevertheless showed that appellant's body contained some lesser amount that would have been consistent with appellant's actions on the night of the incident and also consistent with a finding that he was under the influence. At least under the facts as presented here, there would have been no justification for the jury to reject the blood test as a specific indicator of the alcohol level in appellant's bloodstream but accept it as a general indicator of appellant's intoxication.

Along this line, it may be noted that appellant's sole attack on the methodology used by Spratt in testing the blood samples, had it been developed more fully, might have supported such a conclusion in this case. Broskey challenged Spratt's use of point one and point two alcohol standards to test the blood samples, instead of a standard closer to the alcohol reading in the samples. By using standards lower than the reading, Spratt may not have achieved an entirely accurate test result. As we read Broskey's testimony, the alcohol in the samples may have been somewhat lower than .275%, although still above .200%, or above the alcohol level in the highest standard used by Spratt. If the alcohol in the samples was indeed less than .275%, then appellant's appearance of sobriety on the night of the incident may not have been so unusual. However, Broskey's testimony on this point was too cryptic for the jury to have reached such a conclusion.

population would be able to hide the effects. Given this testimony, the jury could have properly found as follows: that the test tubes given by the laboratory technician at Paoli Hospital to Pierson contained appellant's blood; that Pierson delivered this blood to Spratt at Upjohn Clinical Laboratories; that the alcohol content of the samples did not change significantly between the time the blood was drawn and the time it was tested; that Spratt's testing of the sample produced an accurate result; that appellant's bloodstream at the time the samples were drawn therefore contained .275% alcohol; and that appellant was a member of the "small percentage" of the populace that does not readily exhibit signs of intoxication at this level.[4] Appellant cannot complain that the jury found him to be within this small percentage. As has been pointed out elsewhere with great cogency, our criminal justice system, founded as it is on the principle that a criminal conviction must be based upon proof beyond a reasonable doubt, resists the notion that guilt and innocence may be determined solely accordingly to statistical probabilities. See Nesson, Reasonable Doubt and Permissive Inferences: The Value of Complexity, 92 Harv.L.Rev. 1187 (1979). It was for the jury to consider and weigh the evidence as it was presented to them. Their examination necessarily involved a weighing of Spratt's testimony that she conducted the tests of the blood samples properly and could not have made a mistake, and of Dr. Phillip's testimony that he did not believe that the alcohol level of the blood samples changed significantly, if at all, between the drawing of the blood and the testing. The jury was also entitled to consider whether the shock of the accident and the exposure to the cold air made appellant appear more sober than he truly was.

4. We reject appellant's claim that the Commonwealth did not sufficiently prove the chain of custody of the blood samples because the technician who drew the samples was not called to testify. Because Pierson observed the technician's procedure in drawing the samples, the Commonwealth was not compelled to call the technician. See generally Commonwealth v. Rick, 244 Pa.Super. 33, 366 A.2d 302 (1976); Commonwealth v. Miller, 234 Pa.Super. 146, 339 A.2d 573 (1975), aff'd, 469 Pa. 24, 364 A.2d 886 (1976).

Appellant claims that even if the jury could find that the alcohol content in his blood was .275% at 2:42 a. m., the time the samples were drawn, the evidence still did not show that this amount was present in his blood at the time of the accident more than two hours earlier. Appellant does not claim that between the time of the accident and the drawing of the blood at the hospital he consumed alcohol, or, which is more important, that the jury was precluded from finding that he did *not* consume alcohol during this period. Appellant's point is that some time always elapses between the consumption of alcohol and its absorption into the bloodstream, and that alcohol has no effect on a person until it enters into the bloodstream. The period needed by a body to absorb alcohol varies from thirty to ninety minutes. *Schwarzbach v. Dunn*, 252 Pa.Super. 454, 381 A.2d 1295 (1977) (plurality and concurring opinions); Richard E. Erwin, Defense of Drunk Driving Cases (3d ed. 1978) § 15.02 at 15–18.11. Thus, appellant's theory goes, all the alcohol he consumed prior to the accident had surely been absorbed into his bloodstream by the time the blood samples were drawn, but there is no evidence as to how much was in his blood at the time of the accident. Had appellant consumed most of the alcohol at Martin's house immediately before leaving for the Valley Forge Sports Garden, then very little alcohol may have been in his bloodstream at the time of the accident, and if so, he was not guilty of driving under the influence of liquor.

■ There is no question that the blood test, even though taken more than two hours after the accident, was admissible. So long as a blood test is indicative of a defendant's condition at a relevant time, it is admissible and subject to attack or contradiction by other competent evidence. Thus, we have upheld the admission of blood tests when blood was drawn four and a half hours after the defendant's operation of a motor vehicle. *Commonwealth v. Trefry*, 249 Pa.Super. 117, 375 A.2d 786 (1977). *See also Commonwealth v. Tylwalk*, 258 Pa.Super. 506, 393 A.2d 473 (1978) (delay of an hour and a half between operation of

motor vehicle and drawing of blood goes only to weight not admissibility of test). Here, although the jury might have concluded that the Commonwealth failed to show that the blood test taken at 2:42 a. m. reflected appellant's condition at the time of the accident, the jury was not constrained to do so. In particular, we note that the testimony of Cassidy, Carbo, and Pierson established that appellant's demeanor before and after the accident did not change. Thus, we do not have a case where the accused appeared sober at the time he operated a motor vehicle but later was obviously intoxicated. Moreover, although the Commonwealth did not specifically identify the period during which appellant consumed alcohol, several parts of the evidence indicate that consumption occurred sufficiently before the accident to have allowed the alcohol to pass into appellant's blood. Cassidy testified that he, Hawley, and appellant arrived at Martin's house sometime between 10:30 and 11:00 p. m. and that they did not leave until approximately 12:30 a. m. During this period, the evidence is, people were drinking, and there is nothing to indicate that at this New Year's Eve gathering, appellant had little or nothing to drink until immediately before his departure from Martin's. Furthermore, the evidence is that appellant supplied part of the beer and champagne consumed at Martin's house, and similar empty beer cans (sixteen ounce cans of Miller beer) were found by Pierson in appellant's car. This evidence, together with the evidence that appellant had just returned from New York when he appeared at Cassidy's house, entitled the jury to find that appellant had been drinking earlier in the evening. Finally, the evidence that an accident occurred, while not strongly probative that appellant was driving under the influence of liquor (especially given Cassidy's testimony that the accident occurred when appellant's sportscar skidded on ice as it entered a curve), was still corroborative of the other evidence showing that appellant was indeed under the influence. *See Commonwealth v. Funk*, 254 Pa.Super. 233, 385 A.2d 995 (1978). The accident showed that appellant lost control of his vehicle while driv-

ing, thus indicating that his senses may have been impaired at the time.

Since the jury was entitled to find that appellant had approximately .275% alcohol concentration in his blood at the time of the accident,[5] it follows that it could have concluded that he was driving under the influence of liquor. The Motor Vehicle Code provided that if a chemical analysis of a person's blood shows that the amount of alcohol by weight in the blood of the person is .10% or more, a jury may infer that the person was under the influence of intoxicating liquor. 75 P.S. § 624.1, *repealed by* the Act of June 17, 1976, P.L. 162, No. 81, § 7 (effective July 1, 1977).[6] *See also Commonwealth v. Difrancesco*, 458 Pa. 188, 329 A.2d 204 (1974); *Commonwealth v. Gearhart*, 253 Pa.Super. 238, 384 A.2d 1321 (1978). Here the amount of alcohol in appellant's blood exceeded greatly the amount needed to trigger the statutory inference; and, as noted above, although the symptoms exhibited by appellant before and after the accident tended to contradict the amount of alcohol shown by the tests to have been in appellant's blood, other circumstantial evidence existed to corroborate the test results.

Appellant's remaining arguments do not warrant extensive discussion.

Appellant argues that the results of the blood tests were inadmissible because Pierson did not have reasonable cause to believe that appellant was under the influence of liquor, and that even if Pierson had reasonable cause, he still should not have ordered a blood test when there was no indication that appellant was physically unable to perform a breathalyzer test. In making these arguments, however, appellant overlooks the fact that he voluntarily consented to the performance of a blood test.

5. Actually, the jury might have found that the alcohol in appellant's blood was somewhat higher than this at the time of the accident given Spratt's testimony that appellant would have been metabolizing the alcohol in his body at the rate of .02% per hour.

6. This statutory inference is now codified at 75 Pa.C.S.A. § 1547(d)(3).

At the suppression hearing, appellant testified that at the hospital Pierson read to him his *Miranda* rights, and that he understood those rights. He further testified that although he was nervous and upset at the time, no one forced him to take the test, and that Pierson did not say that he had to take it. Appellant could remember nothing coercive about the test, the nurse, the doctors, or Pierson, and understood at the time what a blood test was. He also testified that he consented to the test. It may also be noted that appellant was eighteen years old at the time.

Appellant's testimony was corroborated by Pierson's testimony at the suppression hearing, which was as follows. When Pierson arrived at the hospital he was in uniform, and identified himself to appellant. Pierson told appellant that he believed that appellant had been drinking, that appellant had the right to remain silent, that if he said anything such could and would be used against him in a court of law, that appellant had the right to talk to a lawyer before answering any questions and to have a lawyer with him before and during questioning, that if appellant could not afford a lawyer a free one would be appointed, and that appellant could stop and refuse to answer any questions. Appellant indicated to Pierson that he understood these rights, and although Pierson could not remember whether appellant said he wanted a lawyer, he testified that had appellant made such a request, he would not have asked him any questions. After interrogating appellant about the accident, Pierson read to appellant the contents of a permission slip that would allow hospital personnel to draw blood from him for an alcohol test. Appellant signed the form. Prior to appellant's signing, Pierson made no threats or promises of rewards to appellant.

■ Appellant argues that his consent to the blood test was involuntary because Pierson failed to inform him that he could refuse the test and that the test results could be used against him in a criminal prosecution for the operation of a motor vehicle while under the influence of intoxicating liquor. However, whether consent to a search is, in fact,

voluntary or the product of coercion, express or implied, is a question of fact to be determined from all the circumstances. *Commonwealth v. Reynolds*, 256 Pa.Super. 259, 269, 389 A.2d 1113, 1118 (1978) (collecting cases). Here we believe the Commonwealth met its burden of proving that appellant's consent was freely given. No contention is made that appellant was unlawfully arrested (or for that matter arrested at all) at the hospital, or that appellant had reason to believe that he was arrested. Pierson's interrogation and the drawing of the blood samples occurred at the hospital where appellant was taken to receive treatment and within a relatively short time after the accident. These facts, together with the uncontradicted testimony that appellant had been told that he did not have to answer Pierson's questions, that any information he gave could be used against him in a court of law, and that appellant nevertheless consented to the test, convince us that the failure to give additional warnings at the time appellant signed the consent form did not vitiate appellant's consent. *Compare with Commonwealth v. Watkins*, 236 Pa.Super. 397, 344 A.2d 678 (1975).

Appellant also complains of the admission of photographs depicting appellant's sportscar after the accident. Appellant argues that the photographs were irrelevant to the issues of the case, and were prejudicial. The photographs, however, were relevant to the issue of whether appellant was operating an automobile on Swedesford Road during the early morning hours of January 1, 1977. They were also relevant to the second issue the Commonwealth had to prove—whether appellant was under the influence of liquor at the time. In determining whether appellant was under the influence, it was proper for the jury to consider the circumstances surrounding the accident. *Commonwealth v. Long, supra.* Nor, given their relevance, are we willing to find that the photographs should have been excluded because they were unduly prejudicial to appellant. The admission of photographs in a criminal case is within the discretion of the trial court, and will not afford grounds

for reversal absent an abuse of that discretion. *E. g., Commonwealth v. Schroth*, 479 Pa. 485, 388 A.2d 1034 (1978); *Commonwealth v. Reese*, 237 Pa.Super. 326, 352 A.2d 143 (1975). From the description of the photographs in the record and in the lower court's opinion,[7] we cannot say that the relevance of the photographs was outweighed by the prejudice suffered by appellant.

Appellant's final argument is that the district attorney impermissibly commented on appellant's failure to testify at trial. During closing argument, the district attorney stated:

> Each of you comes from a different background and you bring, collectively, the highest level of wisdom that exists in this Courthouse today. Each of you know how people tell the truth and what to look for. They look you in the eye and look away. You have to evaluate what is right and fair in this case and whether your background comes from labor or from business or perhaps even in the field of nursing or in the home, as I said before, you sense things, you appreciate what is said and what maybe isn't said and how certain things are held back, maybe why they were held back. That's what you bring in here and what you take with you. You don't leave your common sense here when you go through that door and deliberate. Please take it in there with you.

Record at 215A.[8]

We do not believe that the district attorney's comment indicates a duty on appellant's part to testify or permits an unfavorable inference to be drawn from his failure to do so. *Commonwealth v. Adams*, 234 Pa.Super. 475, 341 A.2d 206 (1975); *Commonwealth v. Kloch*, 230 Pa.Super. 563, 327 A.2d

**7.** The exhibits introduced at trial, including the photographs, have for some reason not been included in the record transmitted to us on appeal.

**8.** The closing arguments of counsel were not transcribed except for the district attorney's comment quoted above. The transcription of this comment, however, appears only in the reproduced record and the lower court's opinion. We fail to understand its omission in the original record.

375 (1974); *Commonwealth v. Reichard,* 211 Pa.Super. 55, 233 A.2d 603 (1967). The district attorney's comment appears to us to be addressed to the demeanor of the witnesses who did testify. We also note that at appellant's request the lower court gave a complete instruction to the effect that appellant did not have a duty to testify and the jury was not allowed to draw any unfair or adverse inferences from his failure to do so.

Affirmed.