Commonwealth *v.* Romanic, Appellant.

Argued March 20, 1933.   Before FRAZER, C. J., SIMP-
SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

416

*B. A. Sciotto,* with him *George Jerko,* for appellant.

*E. E. Creps,* Special Assistant District Attorney, with him *W. M. Ruddock,* District Attorney, for appellee.

OPINION BY MR. JUSTICE DREW, April 17, 1933:

The appellant, Dominic Romanic, charged with the killing of one Joe Jordon (Giordano), was found guilty of murder of the second degree and sentenced to imprisonment for a period of not less than seven years and six months and not more than fifteen years; he then took this appeal, alleging trial errors.

Romanic and Jordon were residents of Creekside, Indiana County, and lived on the same street, in almost adjoining houses. On January 11, 1932, Jordon left his home in the early morning to go to work and shortly thereafter met Romanic, who shot him three times in the chest. There were no eyewitnesses to the event. The cries of the wounded man brought to the spot a neighbor, Joe Marsico, to whom he stated that Dominic had shot him. He died within a few minutes without giving any further account of the occurrence.

At the trial Romanic pleaded self-defense, and told the following story. He and Jordon had been good friends until the preceding August 15th, when Jordon destroyed some tomato plants in his garden; later the bad feeling was increased, when Jordon shot his cat. He said Jor-

don had threatened to kill him on several occasions, and once had actually made an attempt on his life. He stated that on the morning of the killing he got up about six o'clock and went to the store to purchase soap for his wife. Finding the store closed, he started home, and on the way met Jordon, who stopped him, got in front of him, and would not let him pass, and threatened to do him harm if he did not move. He said he stepped back from Jordon, that the latter followed him, threw down his dinner bucket, "put his hands in his back," and immediately tried to grab him, and that he then fired the fatal shots with the gun he was holding in his hand. This, he stated, he did to save his life. He did not attempt to explain how the gun happened to be in his hand at that time. It was conceded at the trial that Jordon was unarmed at the time he was killed. After the shooting Romanic threw his gun away and fled to a farmhouse about three miles from Creekside, where he was apprehended by police officers that afternoon. He was alone in the house at the time, the owner, its only occupant, being away at work all the time he was there. He offered no resistance to arrest and freely admitted the shooting. He told the officers that Jordon had been tormenting him, that he had stood it as long as he could, and that he had had an argument with him that morning and had shot him in a fit of anger.

There was evidence that for some time there had been bad blood between the two men. This is shown not only by the testimony of Romanic, but also by that of his wife, who testified that Jordon had told her that he would kill her husband and his whole family if they did not move away. Furthermore, three witnesses, at whose home both men frequently called, testified that Romanic had said he would shoot Jordon for destroying his tomato plants, and that Jordon had said he would shoot Romanic for saying that he had done so.

The first and principal assignment relates to the exclusion of evidence that deceased belonged to the Black

Hand Society, offered to show defendant's state of mind at the time of the shooting. On direct examination, defendant was asked, "State whether or not Joe Jordon belonged to the Black Hand Society?" To this question objection was made, whereupon defendant's counsel offered to prove that "decedent belonged to a Black Hand Society, to be followed by testimony of the defendant to any various actions that the decedent committed, such as collecting money at various places, and also the admission by the decedent to the defendant that he belonged to the Black Hand gang, and that if anybody would report him for the violation of any law he would kill him after he would get out of jail if he were sentenced; that the defendant has knowledge of the violent and desperate character of the decedent. The defense will follow this offer with testimony on the part of the defendant to show the purposes and motives of that organization in order to establish before the jury the condition and frame of mind of the defendant at the time of the shooting." The Commonwealth's objection was sustained, and the offer was rejected.

The question was clearly incompetent, as the court ruled, unless it was supported by an offer which would make it relevant. The offer made, as a whole, was equally incompetent. The only significant thing in the offer is the use of the name "Black Hand Society," and that has significance only because of its notoriety and not because of anything of a criminal nature which counsel offered to prove. If the name of some other society had been used instead, it would immediately be apparent that the testimony offered was wholly immaterial and clearly incompetent. That the deceased belonged to a certain society had no probative value in showing him to be a desperate and violent character, of whom defendant was reasonably afraid, unless it were also shown that the society was composed of men of that type. The offer, while it proposed to show the motives and purposes of the organization, was insufficient because it did

not offer to prove that these motives were of such unlawful and violent nature that its membership was composed of desperate and lawless men. Without a statement that the purposes of the Black Hand Society were violent and lawless, the offer was merely one to show that deceased belonged to some society or organization of which it was proposed to show the motives and purposes. To accept testimony under such an indefinite offer would have been error and would have opened the door to irrelevant, and perhaps prejudicial, testimony. See Com. v. Szachewicz, 303 Pa. 410. It would be contrary to fundamental rules of evidence to permit an inquiry into the aims and purposes of an organization to which Jordon belonged, without first offering to prove that membership in such organization, because of its aims and purposes, had or might have had something material to do with the alleged conduct of Jordon at and before the killing. It certainly cannot be said as a matter of law that the Black Hand Society is an organization of such nature that a mere offer to show its purposes, without stating in the offer that those purposes are violent, is an offer of testimony to show that one alleged to be a member of that society is a desperate character.

In all this offer, the only thing now objected to is the refusal of the court to allow defendant to show whether or not Jordon belonged to the Black Hand Society. Defendant admits, as he must admit because the record is clear on the subject, that he himself was permitted to testify to the alleged violent and dangerous character of the deceased, and that his wife and other witnesses in his behalf did so.

Defendant relies upon Com. v. Curcio, 216 Pa. 380, Com. v. Varano, 258 Pa. 442, and Com. v. Principatti, 260 Pa. 587, as establishing that evidence of membership by the deceased in the Black Hand Society was admissible. In the Curcio case, defendant testified that the man he shot, one Ferrio, had demanded money of him,

and threatened to kill him if he did not pay, that he had been informed that Ferrio was a member of the Black Hand Society, and that he believed that organization to be an oath-bound society whose members levied blackmail and committed robbery and murder; no objection was made to the admission of this testimony. This case is not in point, because the defendant was permitted to testify without objection, and he did testify to the lawless nature of the purposes of the Black Hand Society. In the Varano case, it was held that it was not improper to permit the district attorney to ask certain of defendant's witnesses whether they were members of the Black Hand Society, in order to test their credibility. This case in no sense rules the case at bar; violence as a characteristic of the society was not there in question. In the Principatti case, the defendant offered to prove that the man he shot (Amodeo) had told him he was a member of the "Black Hand gang" sent to kill him, that Amodeo had demanded money of him, that the "Black Hand gang" was a society of men who extorted money under threat of killing, and that he believed that if he did not pay the money demanded Amodeo would kill him; it was held error to refuse to admit testimony to this effect. In this case, the only one cited really in point, the offer stated the purposes of the Black Hand Society, the very point in which the offer in the instant case was deficient.

Defendant also complains of the exclusion of testimony of three of his witnesses to the effect that Jordon had stated to them that he had killed a priest in his native country and had fled to the United States, which was offered for the purpose of proving that deceased was the aggressor at the time he encountered defendant. This evidence was properly rejected. Mere testimony that Jordon had stated that on a previous occasion, many years before, he had killed a man, without any evidence as to the circumstances surrounding the occurrence and tending to show how far his conduct was

blameworthy, was not relevant to establish that his character at the time of this killing was that of a violent and dangerous man and hence that he was probably the aggressor in the encounter with defendant. Cf. Com. v. Straesser, 153 Pa. 451, 456. We do not mean to say that evidence of specific acts of violence may not be relevant on an issue of this kind in some cases, as where it appears that the display of violence occurred so short a time before the killing that it reasonably tends to show the violent frame of mind of deceased at the time of the alleged aggression on his part, or where it appears that acts of violence were so frequently committed by him that the jury may properly infer that he was of a violent and quarrelsome character. The cases cited in Wigmore, Evidence (2d ed.), section 198, as admitting evidence of specific instances of violent or quarrelsome conduct of deceased to establish his turbulent character are all of this nature.

A number of assignments relate to alleged errors in the instructions to the jury. We find merit in none of them. Complaint is made of that portion of the charge in which the jury was told that if an unlawful killing is proved, it is presumed to be murder of the second degree, and the burden of proving it murder of the first degree rests upon the Commonwealth, that of reducing it to a lower grade of homicide upon the defense. This is a correct statement of the law: Com. v. Drum, 58 Pa. 1; Com. v. Mika, 171 Pa. 273; Com. v. Reed, 234 Pa. 573. Defendant also complains that the court failed to instruct the jury on the law of flight. That defendant's flight raised no presumption of guilt was stated in affirmance of one of defendant's points for charge, and the learned trial judge properly added that the fact of flight was a circumstance to be taken into consideration by the jury. See Com. v. McMahon, 145 Pa. 413; Com. v. Luccitti, 295 Pa. 190. Equally without merit is defendant's contention that the charge showed bias and prejudice against the defendant. The statement that "imme-

diately after the shooting the defendant fled, secreting himself in an unoccupied house some three miles distant from the place where the shooting took place" is assigned as error. Obviously the trial judge meant "unoccupied" in the sense that no one else was in the house during the time the defendant was there, and the jury, having heard the testimony, could not have misunderstood him. The charge was clear and impartial, and it correctly stated the law applicable to the case. It is unnecessary to consider the other assignments of error relating to the charge; they are wholly devoid of merit and are all overruled.

A careful examination of the record convinces us that defendant was very fortunate; from the evidence, he might very well have been found guilty of a graver crime. The jury evidently disbelieved his story, as well they might.

All the assignments of error are overruled, and the judgment is affirmed, the record to be remitted in order that the sentence may be carried out.