Commonwealth *v.* Jordan, Appellant.

Argued November 20, 1961; reargued April 30, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Albert S. Fein,* with him *Charles S. Schermer,* and *Fein and Johanson,* for appellant.

*William H. Wolf, Jr.,* Assistant District Attorney, with him *Arlen Specter,* Assistant District Attorney, *Paul M. Chalfin,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, May 22, 1962:

The defendant, after jury trial, was found guilty of murder in the first degree and his punishment fixed at life imprisonment. From the judgment of conviction and sentence, this appeal is prosecuted.

According to the overwhelming mass of testimony offered by the Commonwealth, the killing was a cold, cruel, malicious and planned murder. It can be fairly and briefly summarized as follows:

The defendant and one Louise Hickson lived together "off and on" in her apartment in the city of Philadelphia for a period of time, under meretricious circumstances. During the months of June and July, 1959, their relationship became strained because, among other things, of his failure to help defray the cost of the household expenses and his relationship with another woman of which he openly boasted. Over the weekend of July 31, he was the guest in the apartment of this other woman. Over the same weekend, Louise had as guests in her apartment her sister, Vertell Hickson, and the latter's boy friend, Ronald Berry.

On August 4, Louise told the defendant that she did not want anything further to do with him and that

their relationship was at an end. The defendant attempted to dissuade her, but to no avail. During these conversations, Ronald Berry took Louise's part which the defendant bitterly resented, causing him to threaten Berry with serious bodily harm and to engage in other conduct patently manifesting bitterness and hatred.

Late in the morning of August 4, Louise, her children, Vertell Hickson and Ronald Berry went out visiting. Their departure was immediately preceded on the stairway in the hallway of the apartment by bitter words during which the defendant threatened to shove Berry "out of the second-story window" and, finally, to say, "I'll get you when I come back." While Louise and her guests were gone from the apartment, the defendant went out and bought a gun. In order to do so, he traveled by bus and by subway to another section of the city. He then returned to the apartment and sat to await the return of Louise and her guests. He placed the gun on the top of the refrigerator with a cloth over it.

When Louise and party returned to the apartment later on in the day, the windows were all closed and the shades drawn. Ronald and Vertell sat down at a table and engaged in a game of cards. The defendant was in an angry mood and resumed the argument with Louise as to why she was leaving him. In the course of this conversation, he threatened "to blow all their brains out." He then directed his conversation to Berry, telling him that he had taken offense at what Berry had said earlier in the day. Berry replied that what he had said meant no harm but if the defendant didn't like it, there was nothing he could do about it. The defendant replied, "Well, I promised the next time a man said anything to me I didn't like or did anything to me, I'm going to get him before he gets me." He then walked to the refrigerator, grabbed the gun and pointed it at Berry. As the latter stood

up, saying "I'm not afraid of your gun," the defendant retorted, "I'll kill you" and shot Berry in the neck. Vertell jumped up from the table screaming, the defendant turned to her and said, "You want some of it too" and then shot her in the abdomen. The defendant then turned toward Louise threatening to kill her with the gun but finally decided against it for the sake of her children.

As Berry and Vertell lay on the floor, both begged for a doctor. The defendant told Berry to get up and get one himself. When Berry said he couldn't move, the defendant sneered, "Well that's too bad, because I want you to die. . . . I want you to die slow. I want you to be damned near dead when you get a doctor." Both victims begged for water. The defendant filled two jars with water and placed them on the floor but just out of reach of the injured. Berry said he couldn't reach the water and the defendant replied, "Well get it the best way you can."

Ronald Berry died two weeks later. Vertell Hickson eventually recovered.

The defendant was arrested in the street by the police a short time after the affair. He readily admitted he did the shooting. He told the police that "*they*[1] jumped up as if *they*[2] wanted to jump on me so I grabbed the gun and shot them. I guess *I was mad*[3] and didn't realize what I was doing."

The defendant took the stand in his own defense. He testified that at the time of the shooting he was in great fear and that he shot Berry to defend himself. He stated that Berry "made a step toward me, and I just threw the gun up and I must have shot him and the girl. I didn't have no intention of shooting either

[1] Emphasis supplied.
[2] Emphasis supplied.
[3] Emphasis supplied.

of them, but I just went in fear of something, I don't know."

The sufficiency of the evidence to sustain the verdict is not questioned, nor could it well be. The contention that a new trial should be granted is based upon assignments of error involving the conduct of the trial. We shall discuss them ad seriatim.

During the course of the trial, the defendant introduced the testimony of a psychiatrist, Dr. Mallin, as an expert witness. He was presented to the jury with a rather impressive background of credentials including membership on the staffs of seven hospitals and the position of Chief of Neurology and Psychiatry at two of these hospitals.

He testified that he performed a complete neurological and psychological examination of the defendant, totaling approximately three and one-half hours, four months after the occurrence and while the defendant was incarcerated. He stated his conclusions were based on this examination, his own experience and the *history of the occurrence, and the life of the defendant as related to him by the defendant.* He stated that from his information, the defendant had a good background, drank only occasionally, never used drugs, and was never involved in any previous illegal conduct warranting an arrest. In the year 1951, the defendant developed a very serious case of tuberculosis requiring hospitalization for several months and subsequently requiring surgery and the removal of the right upper lobe of the lung. As a result, the defendant told him he developed a supersensitive and constant fear of injury to his chest.

The expert witness further testified that from what the defendant related to him, he understood that on the day of the occurrence there were several incidents in which the defendant had been threatened with

serious bodily injury and that people had moved toward him with apparent intent to attack him. As a result, his constant-existing fear increased, he became very confused and very intently disturbed. On the basis of the defendant's physical condition, past medical history and the occurrences of the day of the shooting as the defendant had related them to him, he concluded that at the time of the shooting the defendant suffered from an intense fear psychosis, which made it possible for him to do something irrational, and not to be aware of what he was doing.

During the course of the witness's examination, the trial judge saw fit to ask several questions involving the nature of the neurological test given, the specific findings and evaluation in the several "groupings" the witness had mentioned in connection with the psychiatric examination. These concerned the "insight" of the defendant; the content of his thought, and his emotional status at the time of the occurrence, examination and trial. Defendant contends that this constituted an "extensive, aggressive" and unwarranted examination by the trial judge. Nothing could be more unsound. The inquiries were reasonable, pertinent and essential. They were not only proper but necessary to render more understandable the doctor's testimony for the jury. The questions were not in the nature of a cross-examination, were not overextended, nor did they indicate bias or argument with the doctor's conclusions. The trial judge, under such circumstances, not only had the right but the duty to pursue the questioning. See, Commonwealth v. Watts, 358 Pa. 92, 56 A. 2d 81 (1948) and Commonwealth v. Horn, 395 Pa. 585, 150 A. 2d 872 (1959). The questions now termed improper were submitted without any objection and a reading of the record indicates that they should have been asked by defense counsel, for the answers, in most part, helped rather than hurt his

client.  See, *Commonwealth v. Carluccetti,* 369 Pa. 190, 85 A. 2d 391 (1952).

It is also strenuously argued that in the course of the charge, the trial judge so disparaged the doctor's qualifications and so evaluated and characterized his testimony, that the defendant was seriously prejudiced. We cannot agree, following a study of the entire record.

In the course of the doctor's testimony, he stated specifically that he had been certified in psychiatry by the American Board.  He did not say that he was certified in neurology.  The trial judge charged the jury that in view of this testimony, the jury could not infer that he had been certified in neurology.  While this observation was unnecessary, we cannot say that it was incorrect or, more importantly, that it was prejudicial.

In charging the jury and discussing the weight to be given the doctor's testimony, the trial judge emphasized that it was merely opinion testimony, that in the law such is considered the lowest type of testimony, unsatisfactory in character, and further that bad as it is, the court permits it because nothing better is available.  We cannot say that, under the evidence in this case, such was unwarranted.

The questioning of the doctor clearly established that he relied upon and based his conclusions upon erroneous and insufficient information.  For example, he made no effort to substantiate the truth of the history given him by the defendant.  Before coming to a conclusion, he refrained from a thorough inquiry into basic facts.  If such had been pursued, he would have determined that all through the fatal day, it was the defendant who was the threatening and attacking aggressor, the one looking for trouble—not the abused and frightened individual the doctor concluded him to be.  In addition, certain clinical and medical records were known and available to the witness; and, ad-

mittedly, he did not seek to study them. He did not administer psychological testing to determine the defendant's mental quotient or any thematic apperception tests for the purpose of seeking corroboration of his findings. In view of all this, the value of the particular testimony is very questionable and the observations of the trial judge were not improper.

In *Commonwealth v. Gossard*, 385 Pa. 312, 123 A. 2d 258 (1956) at 321, this Court reiterated what was said in *Commonwealth v. Patskin*, 375 Pa. 368, 375, 100 A. 2d 472 (1953), namely that "[E]xpert testimony is entitled to little weight as against positive facts. *Expert medical opinions are especially entitled to little or no weight when based upon insufficient or (partly) erroneous facts*[4] or a feigned state of mind or an inaccurate past history, or upon unreasonable deductions, . . . ." Citing cases. In *Commonwealth v. Heller*, 369 Pa. 457, 461, 87 A. 2d 287 (1952), we said, " 'An opinion is only an opinion. It creates no fact . . . . Because of this, opinion evidence is considered of a low grade and not entitled to much weight against positive testimony of actual facts.' " This is probably a more accurate and better expressed test than that enunciated in *Dawson v. Pittsburgh*, 159 Pa. 317, 325, 28 A. 171 (1893), wherein the Court said: "It [expert testimony] is matter of opinion at best, and the lowest grade of evidence that ever comes into a court of justice. It is permissible only because, bad as it is, there is nothing better attainable. Opinion of this as of other kinds are apt to differ, and their value is not always in proportion to the confidence with which they are advanced. It is proper therefore that the jury should have all the aids possible in enabling them to judge of the weight to which any particular opinion is entitled." We direct that in the future trial courts

---

[4] Emphasis supplied.

utilize the language approved in *Commonwealth v. Heller*, supra.

In the instant case, not only was the expert's opinion based upon erroneous information, but the actual facts incident and subsequent to the shooting were proven by positive testimony and these completely negated any claim that the defendant shot out of confusion or fear. It was perfectly proper, therefore, for the judge in reviewing the case to instruct the jury that the expert's testimony was entitled to little weight as a matter of law.

The defendant next complains of the failure of the trial judge to submit the issue of defendant's sanity to the jury. It is claimed that this issue became pertinent in view of Doctor Mallin's testimony. We do not agree. A thorough review of his testimony manifests that it did not include, at any time, an expression regarding defendant's sanity which would have constituted an opinion within the legal concept of the term. He was never asked to state, nor did he volunteer, an opinion concerning the defendant's ability to understand the nature and quality of the act, or whether he knew the difference between right and wrong at the time of the shooting.

Insanity was not raised as a defense at trial. Even after hearing the testimony, counsel did not request the court to charge on this issue. Nor was this alleged error ever advanced in the court below, either in the motion for a new trial or at oral argument. All of which points to the lack of merit in this particular contention. There is no duty on a trial judge to charge upon law which has no applicability to presented facts: *Commonwealth v. Coleman*, 402 Pa. 238, 166 A. 2d 525 (1961).

The defendant next contends that the charge of the trial court constituted fundamental error in regard to the issue of self-defense. The jury was instructed

in the main portion of the charge that in order to sustain the defense that the killing was excusable, the defendant had to prove by a preponderance of the evidence that he was in great fear of his life, or in immediate danger of death or great bodily harm. The judge said that the fear had to be reasonable, the type of fear that a reasonable person would have and *that in determining its reasonableness the physical condition of the defendant at the time had to be considered.* The latter factor was emphasized on more than one occasion.

In differentiating between the features of self-defense and manslaughter, the court said: "Well now, while the evidence in the case may not be sufficient to satisfy you, . . . that the plea of self defense has been sustained and established in this case, the evidence might have appealed to you as sufficient to negative or to throw such a doubt upon the element of malice as to reduce the crime from murder to Manslaughter. In other words, . . . if you find that at the time of the shooting the defendant was not actuated by malice but that he acted under the influence of an uncontrollable mortal fear raised by this threat and conduct of Ronald Berry, and if you find that the immediate circumstances, though adequate to raise the fear, were not sufficient reasonably to justify a belief on the part of the defendant that he was in immediate danger of death or great bodily harm, then the grade of the crime would raise no higher than Manslaughter."

At the conclusion of the charge, counsel for the defendant excepted and argued that in this respect it was erroneous and that the fear required was not that of a reasonable person but rather a fear reasonably justified by the immediate circumstances. The court then further charged the jury as follows:

"Now, I also want to tell you further about voluntary manslaughter, that it consists of an intentional

and unlawful killing of a human being without malice either expressed or implied, but committed under the immediate influence of a sudden passion. Just as malice is the impelling power of murder, either anger or rage or resentment or terror is the impelling power of voluntary manslaughter. Passion includes both anger and terror, provided they reach a degree of intensity sufficient to obscure temporarily the reason of the person affected. A sudden passion which will reduce an unlawful killing to voluntary manslaughter must be due to a legally adequate provocation. The terror from the belief on the part of the defendant that his life is in danger is sufficient, even though his belief is not reasonable. In other words, if he has, in your opinion, a terror on his part, believing that he is in danger of life or grievous bodily harm, that is sufficient, if you find that to exist in him, even though it is not reasonable. Now, that also is true in reference to self defense, and the fear, if you find it to exist, need not be reasonable, if you find it to exist in him.

"When I told you about the plea of self defense, even though you find it not sufficient to prove self defense, it may be used to negative or to throw such a doubt upon the element of malice so as to reduce the crime [to] manslaughter. When you apply that principle of the fear, apply the same one, that it need not be reasonable, if you find that the terror from the belief on the part of the defendant that his life was in immediate danger or he was in great bodily danger, that in itself is sufficient."

A reading of the charge in its entirety discloses that the instructions, as given, were correct: *Commonwealth v. Thompson,* 389 Pa. 382, 133 A. 2d 207 (1957). Hence, there is now no justifiable cause to complain.

Next, the defendant argues that in commenting upon the testimony of two Commonwealth witnesses, (Louise Hickson and Vertell Hickson), the trial judge

told the jury that they could rely on this testimony and thus the court invaded the province of the jury. The portion of the charge submitted as error is taken out of context. When read in its entirety, it readily appears that the credibility of all of the witnesses was left to the jury under adequate and fair instructions. The jurors were told in unmistaken language that they, and they alone, were the fact-finders.

In the instructions complained of, the court was merely saying that if the testimony referred to were accepted by the jury, then a verdict of guilty of first degree murder was in order. Can anyone question the correctness of this statement? The primary duty of a trial judge in charging a jury is to clarify the issues so that the jury may understand the questions to be resolved: *Commonwealth v. Malone*, 354 Pa. 180, 47 A. 2d 445 (1946). In *Commonwealth v. Gable*, 323 Pa. 449, 187 Atl. 393 (1936), this Court held that where the trial judge charged, in referring to the evidence produced by the Commonwealth, that it contained every element necessary to make out a crime of murder in the first degree, and that if such testimony were believed it would be the duty of the jury to render such a verdict, that such instructions did not constitute an improper expression of opinion by the court, where the charge in its entirety left the finding of fact up to the jury. See also, *Commonwealth v. Amzie*, 322 Pa. 193, 185 Atl. 272 (1936).

Lastly, defendant urges that the trial court committed fundamental error in its charge with regard to the presumptions involved in homicide cases. The court stated, in substance, that a *wilful, unlawful killing* is presumed to be *malicious* and murder in the second degree until the contrary appears in the evidence, and where such a killing appears, the Commonwealth has the burden of raising the crime from second degree to first degree by proof of the necessary factors

beyond a reasonable doubt. On the other hand, if the defendant claims the crime is not murder of the second degree, but only manslaughter, the *burden* is on the defendant to prove essential facts which would reduce the crime to manslaughter by the preponderance of the evidence, unless such facts already appear in the evidence.

This argument is inspired by what this Court recently said in *Commonwealth ex rel. Johnson v. Myers,* 402 Pa. 451, 167 A. 2d 295. *Johnson* was filed more than ten months subsequent to the trial of the present case. Therein in disapproving of the instructions to juries that the defendant has the burden of reducing the crime from second degree murder to manslaughter, we specifically stated that our disapproval was to the use of such instructions *thereafter.* It was clearly not intended to make such *retroactive.* Further, the instructions in this respect fully complied with the rules of law on the subject, long established, and in effect as of the date of defendant's trial. See, *Commonwealth v. Wucherer,* 351 Pa. 305, 41 A. 2d 574 (1945); *Commonwealth v. Romanic,* 311 Pa. 415, 166 Atl. 902 (1933); *Commonwealth v. Reed,* 234 Pa. 573, 83 Atl. 601 (1912) and *Commonwealth v. Carroll,* 326 Pa. 135, 191 Atl. 610 (1937).

Likewise, what was said in *Johnson,* to the effect that malice is never presumed except in cases of "felonious homicide," was pure dicta, wholly unnecessary to that decision and in derogation of the law of Pennsylvania as it had been previously promulgated on this subject for decades. See, *Commonwealth v. Wucherer,* supra; *Commonwealth v. Malone,* supra; *Commonwealth v. Gibbs,* 366 Pa. 182, 76 A. 2d 608 (1950); *Commonwealth v. Bolish,* 381 Pa. 500, 113 A. 2d 464 (1955); *Commonwealth v. Drum,* 58 Pa. 9 (1868). What was said in *Johnson* is not the law of Pennsylvania, has no decisional basis, and is, therefore disap-

proved. Malice is presumed not only in cases of "felonious homicide" but also in all situations wherein the Commonwealth has made out a prima facie case of wilful, deliberate and premeditated killing.

All of the assignments of error have been carefully considered. None merit the granting of a new trial.

Judgment affirmed.

Mr. Justice COHEN concurs in the result.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I thoroughly concur in the decision of the Court and heartily approve the verdict. However, I must dissent to that part of the Majority Opinion which finds no fault in the trial judge's instruction on the subject of expert evidence. The trial judge said: "opinion evidence is the *lowest* type of testimony, the *lowest* type of testimony possible to come into a courtroom. And when the defendant produced this testimony from this expert, this doctor, he produced the *lowest* type of testimony." (Emphasis supplied)

After the judge pushed the doctor's testimony into the third subterranean stratum of unreliability, he practically buried it without benefit of clergy, all of which he had no right to do.

The judge's charge, as above quoted, was not only not in accordance with law, but it was an insult to every expert who comes into a courtroom to testify. Many trials could never achieve a just and proper result without the advice, counsel, views and opinions of experts and technicians who, on a given subject, know more than the rest of the witnesses, plus the lawyers and the judges. To characterize these doctors, chemists, mathematicians, engineers, auditors, and electricians as the "lowest of the low" is to do immeasur-

able harm to the cause of justice and to invite guess-work in fields where the layman is without guide, direction or assistance.

The Majority Opinion quotes from previous cases where this Court has approved of derogatory remarks addressed to expert witnesses. Each time this Court places its approval on such abusive language, the expert witness is driven lower into the mire of disrespect, contumely and unreliability,—without cause and without the fairness which should be apparent in every phase of every trial and appeal.

The scoffing characterizations employed by the trial judge in this case, which involved the solemn charge of murder, was, as I see it, wholly improper. The trial judge could have pointed out wherein he believed the expert testimony was not convincing but for him to say that it was low, low, low was to substitute invective for analysis, name-calling for description, and stigma for exposition. The value of a witness's testimony is not to be determined by altitude or depth. What makes testimony "the lowest type of testimony"? To speak in terms of "lowness" is to enter into the sphere of morality, and to ascribe to a witness deviation from rectitude, without any evidence to support turpitude is to inflict a gratuitous harm the judge is not authorized to inflict.