## New Castle Area School District Application

*Jonathan Solomon,* for appellant.

PER CURIAM, April 22, 1977 — The New Castle Area School District initiated this proceeding by filing a petition requesting court approval to fund an unfunded debt of $698,000. In due course, notice of the hearing on the petition was given to the local government unit and its taxpayers, and a public hearing on the petition was held before the court en banc on April 7, 1977.

The courts of this Commonwealth do not function as super school authorities. The responsibility for the proper operation of a school district was imposed by the legislature upon the duly elected school directors and not on the courts. Hence, the courts will not interfere with the exercise of the powers vested in public officials unless those officials acted illegally, capriciously, arbitrarily, fraudulently or with gross abuse of discretion: Strunk v. Rubino, 22 Chester 159 (1974).

The legislature has wisely required a school district to prepare and adopt a budget for each fiscal year. The budget should reflect as nearly as possible the estimated revenues and expenses for the year for which it is prepared. Cf. Coleman v. Stevenson, 20 Pa. Commonwealth Ct. 498, 343 A.2d 375 (1975). That the legislature intended the school district to operate during the fiscal year within the framework of the budget is apparent from the amendment to the Public School Code[1] of

1. Act of March 10, 1949, P. L. 30, 24 P. S. §1-101 et seq.

August 13, 1963, P.L. 770, sec. 1,[2] which provides:

"No work shall be hired to be done, no materials purchased, and no contracts made by any board of school directors which will cause the sums appropriated to specific purposes in the budget to be exceeded."

However, it is also plain that the legislature did not expect a school district to be clairvoyant or that the budget would anticipate every conceivable fiscal contingency that could arise during the fiscal year. It, therefore, provided a school district with statutory procedures authorizing amendments to the budget or a deviation from it under certain prescribed conditions. Whether the school district's decision to deviate from the budget must be approved by either the courts or the electorate depends primarily upon the nature and extent of the proposed deviation.[3]

The legislature clearly required court approval of a school district's decision to fund an unfunded debt because substantial budgetary deviations are

2. 24 P.S. §6-609.

3. Compare the Act of August 13, 1963, P. L. 770 sec. 1, 24 P. S. §6-609, authorizing funds budgeted for one purpose to be transferred and appropriated for another, and the Act of July 12, 1972, P. L. 779, sec. 501 et seq., as amended, 53 P. S. §6780-201 et seq., authorizing the borrowing against current revenues with the Act of December 1, 1965, P. L. 1007, sec. 1, as amended, 24 P. S. §6-632, requiring that the assent of electors shall be required to issue bonds which will incur any new debt or increase the indebtedness to an amount in excess of five percent of the assessed valuation of property taxable for school purposes therein, and the Act of July 12, 1972, P.L. 779, sec. 509 et seq., 53 P.S. §6780-209 et seq., requiring court approval of a school district's decision to fund an unfunded debt.

ordinarily involved. The enabling act[4] limits the function of the court to a determination of whether the school district has satisfied the specific statutory standards and requirements for the funding of an unfunded debt. If the court finds in the affirmative, the petition must be approved, but if the court finds otherwise, the petition must be denied. It is, therefore, clear that the courts possess no discretionary powers and cannot grant court approval unless the statutory requirements are satisfied.

A proceeding to fund an unfunded debt is wholly governed by the Local Government Unit Debt Act[5] which sets forth in clear and unambiguous language the standards and requirements that must be satisfied by a school district before court approval may be granted. It clearly imposes on the courts a mandatory duty to approve a petition for the funding of an unfunded debt only if the evidence of the school district shows: (1) That the debt to be funded is an unfunded debt as defined in section 509 of the act, and (2) that the school district has complied with the four specific requirements set forth in section 512 of the act.

In this adjudication we need not consider the evidence as it relates to section 509, for the evidence is patently insufficient to show compliance with the requirements of section 512 which, in pertinent part, provides: "After hearing . . . the court shall make an order granting authority to fund all or a part of such unfunded debt if the court shall find . . .

"[1] that such unfunded debt was lawfully incurred; [and]

4. Act of July 12, 1972, P.L. 779, sec. 512, as amended, 53 P.S. §6780-212.

5. Id.

"[2] that there has been an unforeseeable decline in revenues, or that taxes levied have not produced the revenues anticipated or that it was not reasonable to foresee such obligation; [and]

"[3] that paying such debt by curtailing municipal services will be dangerous to the public health, safety or education; and

"[4] that it is not feasible to levy additional taxes in the current fiscal year." (Numerals are supplied.)

It is crystal clear on this record that neither the second nor the third provision of section 512 are satisfied by the school district's evidence and that, the statute, therefore, precludes court approval of the petition to fund an unfunded debt. Since court approval obviously cannot be granted, a further discussion of the remaining provisions would be only superfluous. The year-end accounting shows most of the more than 30 categories in the budget were either under or overestimated by comparatively small amounts. However, the school district properly limited its evidence to those categories of the budget that were material to this adjudication and only such relevant accounts will be discussed in this opinion.

The evidence consisted of several exhibits together with the testimony of William Thompson and Russell Horchler, the business manager and superintendent of schools, respectively. It showed that the school district operated on a fiscal year commencing on July 1st and ending on June 30th of the following calendar year; that the regularly adopted budget showed anticipated revenues and expenditures of $9,246,915 for the 1975 fiscal year; that the year-end accounting for that fiscal year indicated a shrinkage in anticipated revenues

of $539,199 and overexpenditures of $159,215, and that the school district ended the 1975 fiscal year with a total deficit of $698,414.

## I. SHRINKAGE OF REVENUE

According to Mr. Thompson's testimony, the amount of the State subsidy is computed by a formula based upon the number of students served by the school district. In the 1975 fiscal year, the school district actually received $4,206,178 in State subsidies, or $93,822 less than the amount of State subsidies anticipated in the budget. The school district had estimated receipts of $4,300,000 for that year, a sum which was approximately $200,000 above the $4,091,549 actually received in the prior fiscal year. Mr. Thompson stated that the entire difference between the amount of the State subsidies anticipated and those actually received was the result of the "tremendous loss of students which the school system realized in that year based on the prior year."

An omission from the record precludes a judicial finding of an unforeseeable decline in the State subsidy. Such a finding must be bottomed upon some reasonable factual basis that is established by the evidence in the record. Where such evidence fails to show any reasonable basis for anticipating actual receipt of the amount of revenue estimated in the budget, it is insufficient to show merely, as here, that the amount actually received was less than the budgeted amount. The evidence with respect to the anticipated amount of State subsidies estimated in the 1975 budget shows merely that it was in excess of $200,000 over what was actually received in the prior fiscal year. The record suggests no reason for the increase. Moreover, the record vaguely infers that the school

district did not actually expect to receive the full budgeted amount.

But nonreceipt of the entire $498,315 from the termination of the school building authority was the most substantial shrinkage of anticipated revenues in the 1975 fiscal year. Although the evidence affirmatively established that the school district could have terminated the authority in the 1975 fiscal year, it failed to do so until the following fiscal year when it received the amount of $585,000 from the termination. It is significant that the amount of revenue generated by the termination of the authority in the 1976 fiscal year was greater by $46,000 than the claimed total unanticipated shrinkage in revenues in the 1975 fiscal year.

The record affirmatively shows the nonreceipt of this anticipated revenue was patently foreseeable, since it was entirely due to the school district's own inaction. When the 1975 budget was adopted, the school district assumed the obligation of terminating the authority in that year. It was the school district's duty to exercise reasonable diligence to collect all revenues anticipated in the budget. In order to qualify as an unforeseeable decline in revenues within the meaning of section 512, the evidence must show that the nonreceipt occurred for reasons that the school district could not control by the exercise of reasonable diligence or that such a revenue was not collected for a good and sufficient reason. The record is wholly silent concerning the reasons motivating the school district's inaction in this matter.

## II. OVEREXPENDITURES

The 1975 budget indicates that the total expenditures were divided into 13 categories. The actual

expenditures in six categories exceeded the amount budgeted and appropriated by $358,735. The actual expenditures in seven of the categories was less than budgeted and appropriated by $199,520. The petition requests the funding of overexpenditures amounting to $159,215 which represents the difference between the total over-expenditures and the total underexpenditures in all categories.

On this record, the evidence is sufficient to show compliance with the second requirement of section 512 only with respect to an overexpenditure of $39,968 under the heading of instruction. Mr. Thompson satisfactorily explained that the school district was obligated to pay this sum in additional wages by a collective bargaining agreement which was concluded after the budget was adopted.

It is highly significant, however, that there is not a scintilla of evidence in the record relative to any other overexpenditure in the remaining five categories. In order to qualify such obligations for funding, the record must afford a reasonable basis for the conclusion that it was not reasonable for the school district to foresee the necessity of such overexpenditures. A silent record will not support such a finding.

During the course of the 1975 fiscal year, the school board had borrowed $698,414 from the First Seneca Bank and Trust Company. The debt was evidenced by notes of the school district given in anticipation of receipt of current taxes and current revenues. It remained an unpaid obligation of the school district at the conclusion of that fiscal year.

The School Code[6] specifically requires with respect to such unpaid obligations:

"If such loans are not repaid in whole or in part during the fiscal year in which they are made, they, or such amounts as remain unpaid, shall become an obligation upon the following year's budget and shall be included therein and paid not later than the first day of July of the following . . . in school districts of the second, third, and fourth class."

The school district paid the debt on July 1st of the following fiscal year but it did not include it in the budget for that year as required by the statute. But that omission does not in any way change or modify the requirements for funding the present unfunded debt that resulted from the renegotiation of the unpaid debt owed to the bank at the conclusion of the prior fiscal year. The evidence does establish that the school district was acutely aware of the precise amount of the unfunded debt when the 1976 budget was adopted and that the present uncomfortable financial condition of the school district has resulted, in large measure, from poor budgetary practices and controls. The school district could offer no justification for the omission from the 1976 budget of the required provision providing for the repayment of the obligation. The school district simply ignored the problem at that time and could offer no satisfactory explanation for the excessively long postponement of any straightforward decision that would belatedly provide for such payment.

---

6. Act of March 10, 1949, P.L. 30, art. VI, sec. 640, 24 P.S. §6-640.

## III. PAYMENT OF UNFUNDED DEBT FROM CURRENT REVENUES

The third requirement of section 512 plainly imposed on the school district the obligation to produce evidence showing that the payment of the unfunded debt by curtailing municipal services will be dangerous to the public health, safety or education of the children. It is apparent that, to some degree, the failure to satisfy this requirement has resulted from a misapprehension concerning the nature of the evidence required for such proof.

It is hornbook law in personal injury cases that certain issues such as those concerning legal causation or prognosis of an injury may be proved by expert opinion, but that other issues such as those concerning negligence are not susceptible to proof by mere opinion evidence. The Iowa Supreme Court succinctly stated the rule in Grismore v. Consolidated Products Co., 232 Iowa 328, 361, 5 N. W. 2d 646, 663 (1942).

"No witness should be permitted to give his opinion directly, that a person is guilty or innocent, or is criminally responsible or irresponsible, or that a person was negligent or not negligent, or that he had capacity to execute a will, or deed, or like instrument. . . ."

In Halligan v. Lone Tree Farmers Exchange, 230 Iowa 1277, 1283, 300 N. W. 551 (1941), the same court indicated that when a standard, or a measure, or a capacity has been fixed by law, no witness, whether expert or nonexpert, nor however qualified, is permitted to express an opinion as to whether or not the person or the conduct in question measures up that standard. In accord: Briney v. Tri-State Mutual Grain Dealers Fire Ins. Co., 254 Iowa 673, 117 N. W. 2d 889 (1962). The requirements of section 512 are clearly legal stan-

dards and are, therefore, not susceptible to proof by opinion evidence.

Nevertheless, Mr. Horchler was permitted to opine at the evidentiary hearing that payment of the unfunded debt by curtailment of municipal services will be dangerous to the education of the pupils. When pressed to explain in what manner such a curtailment would endanger the proper education of school children, Mr. Horchler responded: "Services would have to be curtailed one way or the other and it could result in rather drastic measures depending on the board's decision." (Emphasis supplied.)

Mr. Horchler's opinion was obviously speculative and totally lacked adequate factual support. A discerning examination of his entire testimony reveals that he could not speak with assurance or with any degree of certainty because he did not know and could not identify the specific municipal services that would have to be curtailed to pay the unfunded debt from current revenues. Where the nature and extent of such required curtailment is unknown to a witness, the opinion of such a witness, no matter how well he is qualified, cannot be other than speculative, for it is not bottomed on an adequate factual foundation.

Our appellate courts have recognized in a long line of decisions that opinion evidence which is based on speculation or mere possibility is entitled to little or no weight, Commonwealth v. Jordan, 407 Pa. 575, 181 A.2d 310 (1962); that an opinion is only an opinion, it creates no fact and is low grade: Smith Estate, 454 Pa. 534, 314 A.2d 21 (1974); Kuchinic v. McCrory, 439 Pa. 314, 266 A.2d 723 (1970); Commonwealth v. Jordan, supra.

It is clear as crystal that the education of school children would suffer adverse effects

272

if there were a substantial curtailment of municipal services to the extent required for payment of the unfunded debt of $698,000. But such curtailment will not necessarily be dangerous to the public health, safety or education of the school children as required by the statute and the school district's evidence is insufficient to show that such a result will occur. Of course, much will depend upon available alternatives and what decisions are made by the school district with respect to the services to be maintained, modified or eliminated.

In view of the foregoing discussion and citations of authority, it is apparent that the school district wholly failed to qualify the unfunded debt for funding as provided by section 512 of the Local Government Unit Debt Act,[7] and that, in such circumstances, section 512 of that act clearly precludes the grant of court approval to fund an unfunded debt.

### ORDER

Now, April 22, 1977, for the reasons stated in an opinion of this date, the petition of the New Castle Area School District to fund an unfunded debt is refused.

7. Act of July 12, 1972, P.L. 779, sec. 512, as amended, 53 P.S. §6780-212.