**KING OF PRUSSIA ENTERPRISES, INC. t/a Valley Forge Hilton Hotel,**

v.

**GREYHOUND LINES, INC. and Loyal Travel, a division of Greyhound Lines, Inc.**

**Civ. A. No. 76–3924.**

United States District Court, E. D. Pennsylvania.

June 27, 1978.

Michael Yanoff, Norristown, Pa., for Valley Forge Hilton.

Joseph G. Manta, Philadelphia, Pa., for Loyal Travel.

**58**

## MEMORANDUM

DITTER, District Judge.

This suit was brought to recover damages for hotel rooms engaged but not occupied. The matter is presently before the court on Loyal Travel's motion for a new trial and for judgment notwithstanding the verdict.

Plaintiff's Valley Forge Hilton Hotel is located near Philadelphia. In 1976, it was expected that 48 million visitors might come to the Philadelphia area in celebration of the nation's bicentennial. In addition, the Forty-first International Eucharistic Congress was planned for July 31 to August 8, 1976, and it alone was expected to attract more than a million visitors. As a result of a bid submitted to the Chicago Archdiocese, Loyal was designated as the exclusive agent to provide travel services for those from the Chicago area who would be attending the Congress. The Congress also created a housing bureau to refer hotel and motel rooms to the various travel agencies which would be dealing directly with the general public. Both plaintiff and defendant knew of the housing bureau, had agreed to work through it, and were aware that the housing bureau had suggested a payment schedule for any rooms committed. At no time was it intended that the housing bureau contract with any hotel, motel, or travel agent, impose any terms on anyone, or interfere with the right of a hotel and travel agent to reach whatever agreement might be mutually satisfactory.

Hoping to obtain better rooms through direct contact than it had been allocated by the Eucharistic Congress' housing bureau, Loyal sent its area manager, Jose C. Ros, to the Philadelphia area in February, 1976. He visited several hotels or motels seeking the commitment of rooms for Loyal's clients. On February 11, 1976, he came to plaintiff's hotel and talked with Louis Serafine, director of sales, and Milos Hamza, plaintiff's general manager. At trial Hamza testified that Ros wanted to engage all of plaintiff's available rooms, 200 in number, for the period from July 27 to August 9, agreeing to pay $12.50 per person with the understanding that four persons would occupy each room. Hamza also said that he agreed to commit all 200 rooms to Loyal, which he knew to be a subsidiary of Greyhound, only if there would be a ten percent, non-refundable deposit with the balance to be paid 60 days prior to the arrival of the guests. However, up to the 60-day deadline, the rooms could be cancelled and only the ten percent deposit forfeited. In addition, Hamza said that he told Ros that there were two-bedroom apartments at a nearby Hilton building and that additional apartments were available at the Presidential Apartment complex in Philadelphia. Ros was interested in all of these accommodations. As a result of their conversation, Hamza testified he dictated a letter to Ros setting forth the offer of the rooms as outlined in their conversation. Ros took the letter with him and returned to Chicago. By check dated February 27, 1976, Loyal sent $10,000. to plaintiff marking the attached voucher, "Deposit for 200 Rms. at $50. each, four persons max., arrival 7/31/76–8–09/76, Euchararistic Congress." Similar deposits were sent to plaintiff for the two-bedroom Hilton Apartments and the Presidential Apartments. Hamza accepted and deposited all three checks. In view of the change of expected arrival time from that originally discussed, July 27, to that shown on the voucher accompanying the checks, July 31, Hamza expected the balances of payments on May 31. In mid-May he talked with Ros on the telephone and was assured that arrangements were proceeding in a satisfactory way. Not having received a further payment on May 31, Hamza called Ros on June 4 and was assured by Ros that checks for the balances due, a total of $116,800., were in the mail. Hamza called again on June 10 or June 11 and was told by Ros that the checks were not being forwarded from Chicago but from Phoenix and were therefore taking longer than he had expected to reach Hamza. A week later Hamza called again and Ros said that with a big corporation like Loyal and Greyhound, the forwarding of checks took time but that Hamza should not worry about the matter. On June 21, 1976, Ham-

za received a letter signed by Ros dated June 10 and postmarked June 18 stating that Loyal was cancelling all of its reservations and asking for a refund of all deposits made.

Ros testified that he only had a momentary conversation with Hamza and that all of his arrangements had been made with Serafine. Ros denied he had agreed that the rooms would not be subject to cancellation, denied that he had agreed to pay for any rooms not used, and denied he had agreed the ten percent deposit was to be non-refundable. He described his extensive experience in the travel industry and said that he had never made an arrangement with any hotel on the basis of which the right to cancel a reservation had been surrendered or that he had ever agreed to pay for a room not utilized. He also said that the custom in the travel industry is to reserve rooms on the basis of a ten percent deposit with an additional 40 percent within a certain time and the remaining 50 percent 30 days before rooms are to be used. He had never heard of any travel agency which had lost more than its initial deposit of ten percent, and then only if the reservations were not cancelled within the time for the payment of the remaining balance. Ros also said that he was aware of guidelines stated by the Eucharistic Congress, working through its housing bureau, which required a ten percent deposit to secure the commitment of rooms by the hotel, an additional 40 percent 60 days before arrival, and the balance 30 days before arrival. He said the arrangements with plaintiff were cancelled because Loyal's attempts to interest Chicagoans in the Eucharistic Congress were a complete failure.

Two other witnesses appeared for the defendant, Raymond J. O'Brien, a representative of the Eucharistic Congress housing authority, and Richard Lupinacci, the head of a large Philadelphia travel agency. O'Brien testified as to the organization of the housing bureau and its publication of guidelines for the travel and hotel industry. Lupinacci testified as to his experiences in booking tours, reserving hotel rooms, and the practices of the travel industry and its customs. Both O'Brien and Lupinacci said that there were estimates in early 1976 that as many as 48 million people might visit Philadelphia that year and that highly unusual conditions and circumstances then prevailed.

By separate interrogatories submitted to it, the jury concluded there had been a contract between plaintiff and defendant which defendant had breached and that plaintiff was entitled to $58,900. for direct damages. No award was made for consequential damages and no award was made for any loss which the plaintiff may have suffered from defendant's failure to pay for the Hilton two-bedroom apartments.[1] Defendant's motions seeking a new trial and judgment notwithstanding verdict must be refused for the following reasons:

■ 1. There was sufficient testimony to prove the existence of a contract: from Hamza's testimony the jury could have found he offered 200 hotel rooms to Ros on the basis of a non-refundable deposit of ten percent to secure commitment of the rooms (but without additional liability if the rooms were cancelled 60 days prior to the start of the Eucharistic Congress); that this offer was set forth in writing (Exhibit 1); and that the mailing of Loyal's check dated February 27, 1976, constituted a counteroffer, which was accepted by plaintiff's deposit of said check.

■ Plaintiff's evidence through its witness John Dailey and its daily logs (Exhibits 17A through I) provided sufficient basis for the jury's finding that the damages it awarded were:

(a) such as would naturally and ordinarily follow from the breach of contract;

(b) reasonably foreseeable and within the contemplation of the parties at the time the contract was entered into;

---

1. The court granted a defense motion which took from the jury the right to award damages for any loss sustained by the Presidential Apartments.

(c) proven with reasonable certainty, Restatement of Contracts §§ 330 and 331.

■ 3. There was no error in admitting Exhibits 19 and 20 and refusing to admit Exhibit 18. The authenticity of Exhibits 19 and 20 was undenied, their use was limited, and they were not permitted to go to the jury. Defendant had provided testimony that the custom in the travel industry and the guidelines published by the Eucharistic Congress were the same, rooms could *always* be cancelled and a refund obtained. The portions of Exhibits 19 and 20 which may have refuted this contention were not hearsay. Unlike Exhibits 19 and 20, Exhibit 18 was not relevant in that it was directed to a hotel other than plaintiff's hotel; there was no showing that a similar letter was ever sent to plaintiff's hotel; it was not shown that if it had been sent to plaintiff's hotel, it would have any binding or limiting effect on the decisions made by plaintiff's management; or was it suggested that plaintiff agreed to be bound by its terms. Defendant's witness, O'Brien, specifically stated that hotels and motels were free to strike their own deals and that the housing bureau made no attempt to impose any terms on anyone. In addition, Exhibit 18 was merely cumulative to other evidence already received and thus properly excludable under Federal Rule of Evidence No. 403. Insofar as it may have been error to admit Exhibits 19 and 20 even for a limited purpose and to refuse the admission of exhibit 18 for any purpose, these rulings did not affect a substantial right of the defendant. See Federal Rule of Evidence No. 103.

■ 4. The interrogatories submitted to the jury did not suggest that if a breach of contract was found the jury had to make a monetary award. In fact, the jury made no award for consequential damages and no award as to the Hilton two-bedroom apartments. The damage award is not prejudicially ambiguous because there was testimony from both the plaintiff and the defendant that plaintiff had retained all moneys paid to it on account, ($13,200.) and the jury's award, in the context of the testimony, arguments of counsel, and the charge of the court is abundantly clear. Moreover, these interrogatories were discussed with counsel in advance of the court's charge and although counsel suggested different interrogatories, there was no suggestion that the interrogatories submitted mandated an award of damages or that the interrogatories would result in any ambiguity. To the extent that defendant contends that the word "entitled" is ambiguous, the ambiguity is of defendant's creation since this is the word suggested by defendant in its proposed Interrogatory No. 6. See Document No. 40.

■ 5. It was not, error to refuse to charge on liquidated damages. There was no evidence from any witness that if the rooms were not utilized plaintiff's recovery was to be limited to defendant's deposit, nor can Exhibit 1 be so interpreted. It is axiomatic in the law that provisions for the limitation of damages must be clear and unequivocal—the language here is nonexistent. Defendant's witness, Jose Ros, denied he had agreed the ten percent was to be non-refundable. He did not testify that if the rooms were cancelled plaintiff's recovery was to be limited to ten percent. The letter he dated June 10 (Exhibit 7a) asked for refund of the ten percent, while his letter of August 5 (Exhibit 8) threatened to have plaintiff's hotel boycotted by the entire travel agency industry if the deposit was not returned. Implicit in any contract for liquidated damages is the agreement to pay the stated sum. Since Ros denied in these two writings any understanding for the retention of the ten percent, since he did not testify it was agreed the deposit could be retained, since Exhibit No. 1 cannot be interpreted as an agreement for liquidated damages, and since Hamza did not testify there was any agreement that plaintiff's recovery was to be limited to the deposit, there was no basis for a charge on liquidated damages.

■ 6. The court did not err in refusing to instruct the jury on the concept of misunderstanding as enumerated in Restatement of Contracts, Section 21(a) because

there was no testimony from any witness that there was any misunderstanding. Neither plaintiff's witness Hamza nor defendant's witness Ros stated that there was any mistake, misunderstanding, or the attachment of different meanings to their manifestations in February. To the contrary, Ros simply denied he had agreed that the ten percent deposit was non-refundable and denied he had agreed that the rooms were non-cancelable after May 31.[2] The only thing Ros said, which might have been the subject of any misunderstanding was in reference to his letter of August 5, Exhibit 8. In that letter he spoke of "late cancellation of rooms" and stated, "We cancelled the rooms 10 days after the deadline of sixty days . . ." Ros denied this was an admission that the rooms could not be cancelled after the deadline of 60 days, and asserted he was speaking "in travel agency language" about the ten percent deposit. Since this letter was written almost six months after the parties entered into their contract and since Ros was not suggesting that either he or Hamza misunderstood the words used, but only that counsel or the jury might misunderstand them, there was no basis for charging on mistake or misunderstanding.

■ 7. The court did not err in its charge on opinion evidence. In the charge, the court said that positive testimony of a fact is considered to be of a higher grade of proof than that of an opinion, which is said to be a low grade type of proof. Pennsylvania law makes it clear that such a charge in appropriate circumstances is permissible. *Goehring v. Diamond Milling Co.*, 461 F.2d 77, 80 (3d Cir. 1972). See also *Commonwealth v. Jordan*, 407 Pa. 575, 583–84, 181 A.2d 310, 315 (1962), which directs trial courts in Pennsylvania to charge, "an opinion is only an opinion. It creates no fact . . . Because of this, opinion evidence is considered of a low grade and not entitled to much weight against positive testimony of actual facts." One of the major pillars of Loyal's defense was that "no travel agent would ever enter into such a contract such as that asserted by plaintiff, wherein he would become responsible for the entire dollar amount of the rooms reserved." (Brief of Loyal Travel, Document 39, page 6.) To substantiate this defense, Loyal presented the testimony of Lupinacci as to his experiences in the travel industry and its customs. The relevance and indeed the admissibility of much of what he said was questionable. He was not asked to give an opinion as to what Ros would or would not have done, and, of course, such an opinion would have been the grossest kind of speculation. Lupinacci did testify, however, that the travel industry and hotel industry in early 1976 were expecting as many as 48 million visitors to Philadelphia, that the situation was unique in Philadelphia travel history, and that it would be possible that under the circumstances, a travel agent would have been willing to pay money down to tie up rooms even though he had not previously sold them to the public. Whether or not a charge on opinion testimony was required in view of what Lupinacci actually said is doubtful. Having been requested by Loyal, See Loyal's proposed points for charge Nos. 48 and 49, it was incumbent upon the court to charge correctly on this matter and hence the jury was told:

"You should consider carefully the opinions of experts. You should consider the reasons given in support of an opinion expressed by an expert. Bear in mind, however, that you are not bound at all by the opinion of an expert. An opinion is only an opinion. The statement of an opinion does not create a fact. Its only purpose is to help you to determine the facts, to help you, if you find it to be helpful, in deciding what actually occurred. When contrasted to other types of evidence, opinion evidence is referred to as a rather poor grade of evidence, but you may consider any expert opinion that you heard in this case and give it such weight as you think appropriate."

This hardly ". . . served to prejudicially instruct (sic) the jury to disregard de-

**2.** May 31 was 60 days before the rooms were to be occupied.

fendant's witnesses" as defendant contends. See Defendant's brief, Document 39, p. 7.

■ 8. The court did not err by charging that plaintiff's liability evidence was not ambiguous—what the court charged was that the purpose of the evidence concerning custom and usage was to help understand what the parties intended and understood *if* there was uncertainty or ambiguity. The court said that the plain terms of the contract prevail over a trade usage or custom, that evidence of custom or usage cannot be considered to destroy a contract, or to make the rights and liabilities of the parties to a contract other than those created by the contract terms. The court also said that custom and usage evidence cannot create an ambiguity where none exists and that where the terms of an express contract are clear and unambiguous, they cannot be varied or contradicted because they differ from those usually found in a particular trade of business. Whether or not there was ambiguity was left to the jury.

■ 9. The court did not err in failing to discuss the testimony of O'Brien and Lupinacci. The jury was instructed that the weight to be given to the testimony of the witnesses was a jury function, that the opinions of the experts should be considered carefully and given the weight that the jury thought appropriate. To have discussed the opinions of either O'Brien or Lupinacci as supporting erroneous principles of law[3] advanced by the defendant would have been improper.

---

**3.** Defendent argued that custom and usage can create ambiguity where none exists, or can be used to vary the terms of a contract.